Richard Duncan PEARSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 23406.

United States Court of Appeals
Fifth Circuit.

May 25, 1967.

Rehearing Denied June 27, 1967.

Harvey J. St. Jean, Lawrence E. Hoffman, Hoffman & St. Jean, Miami Beach, Fla., for appellant.

Robert C. Josefsberg, James W. Matthews, Asst. U. S. Attys., William A. Meadows, Jr., U. S. Atty., Miami, Fla., for appellee.

Before PHILLIPS,* COLEMAN and SIMPSON, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Pearson was tried, convicted and sentenced on an indictment which charged that on or about September 2, 1965, he did wilfully and unlawfully receive, conceal, store, sell and dispose of and did cause the receipt, concealment, storage, sale and disposal of the "Edith Haggin DeLong Star Ruby" of a value in excess of $5,000, which was moving in interstate commerce from New York City, New York, to Palm Beach County, Florida, well knowing the same to have been stolen, in violation of 18 U.S.C. § 2315 and 18 U.S.C. § 2.

The evidence, considered in a light most favorable to the United States, established these facts: The Ruby weighs 103 carats. It is oval in shape and its color is milky lavender. When light is focused on it, the Ruby becomes blood red in color and a magnificent six-prong star becomes visible therein. A ruby of that size and quality is a rarity. It is doubtful that another ruby like it has ever been found. It is not feasible to cut the Ruby into smaller stones, because that would likely destroy the star and the great value of the stone. Hence, its identity may not be concealed and it is valuable only as a museum piece or a collector's item. As such, it is worth not less than $100,000.

On October 29, 1964, the American Museum in New York City was forcefully entered and a large assortment of jewels, including the Ruby, was stolen therefrom. The thieves were apprehended and thereafter the Ruby was transported from New York City to the area of Palm Beach, Florida, and delivered for safekeeping to a person whose identity has not been established.

Francis P. Antel was a free-lance writer. Antel knew Pearson in 1959 and 1960 and during those years was employed by him in the yacht brokerage business. In March, 1965, Antel began researching with respect to the theft of the Ruby. In April, 1965, Antel and Pearson had a conversation relating to the Ruby. Part of it took place at the West Palm Beach County Court House and part of it at Roxy's Bar on South Dixie Highway in West Palm Beach. Antel showed Pearson his file of research material, which he had gathered with respect to the Ruby, and also some articles he was preparing for a publisher about the theft of the Ruby. Pearson brought up the subject of the recovery of the Ruby and stated there was a possibility "somebody" that he might "be able to contact" would want to get rid of the Ruby "if there were a possibility of immunity." Pearson stated, however, he would want to consider the matter further and it was arranged that Antel should meet Pearson at the latter's home in South Miami the first of the following week. That meeting did not take place, and the matter, for the time being, came to an end. Antel described it as "It just went dead." They did not meet again until the following July.

Richard J. Maline was a detective on the New York City police force and in June, July, August and September, 1965, was engaged in investigating the theft of the Ruby and the other jewels from the museum and in efforts to recover the Ruby. In June, 1965, Pearson arranged for a meeting of himself and Maline at Room 221 of the Skyway Motel, located

---

* Of the Tenth Circuit, sitting by designation.

just outside the John F. Kennedy Airport in Queens, New York City, to discuss the recovery of the Ruby. Maline went to the motel to meet Pearson, but Pearson did not appear. Instead, Pearson called Maline by telephone. Maline thought the call came from Pittsburgh. Pearson requested Maline to meet him in Chicago. Maline took the matter up with his superior officers and they stated he could not leave his duties for as much as four or five days, but that if the Ruby could be recovered immediately he could go to Chicago. Maline so advised Pearson, and Pearson said that he would go on to Chicago and get what information he could and relay it back to Maline.

Thereafter, on June 17, 1965, Pearson and Maline met at the Skyway Motel. Maline registered under the name of Black. The recovery of the Ruby was discussed and Pearson stated that he had friends through whom he might be able to locate the present holders of the Ruby, and that he might act as an intermediary or messenger boy in an attempt to locate the Ruby and obtain its return to the rightful owners. There had been rumors of payments to be made for the return of the Ruby and Maline advised Pearson that neither the City of New York nor its police force would pay one penny for the return of the Ruby.

On July 18, 1965, Maline had a conversation with Antel over the telephone. Antel told him that he could recover the Ruby. Maline replied that he didn't think he could, that he was obstructing justice in New York City, where they were endeavoring to obtain the recovery of the Ruby. Antel said he did not think they could get it, and that he was the only one who could put his hands on the Ruby.

In the meantime, Antel had been introduced to John D. MacArthur [1] and after some discussion respecting recovery of the Ruby, MacArthur had agreed to deposit $21,000 in the First Marine Bank of Riviera Beach, to be used for that purpose. Later, at Antel's request, the amount was increased to $25,000, to cover some additional expenses which Pearson had advised Antel had been incurred by the persons who were to bring about the return of the Ruby.

Thereafter, MacArthur, as a result of a conversation between him and Antel, agreed to place the money in the hands of Antel, to be delivered to the person who claimed he had possession of the Ruby, after it had been placed at a location where MacArthur could possess it, and after he had possessed it and obtained expert opinion satisfying him that it was in fact the Ruby.

On about August 23, 1965, Antel advised Pearson the full $25,000 was available to secure the return of the Ruby. Pearson then called Maline from a pay station, but the substance of the conversation is not disclosed in the record. About a week later, by prearrangement, Pearson and Antel met at the home of a mutual friend and from there proceeded to a pay telephone booth in the Whelan Drug Store in North Miami, where Pearson called another person whose identity is not disclosed and discussed the recovery of the Ruby.

During August and September, 1965, William Federici was a reporter for the New York Daily News and was stationed in southeast Florida. He met Antel in August, 1965. Antel expressed to Federici a desire to work for the Daily News and furnish it with the story of the recovery of the Ruby. Federici stated to Antel "this stuff doesn't work that way" and offered Antel a sum of money for the exclusive story and exclusive pictures of the return of the Ruby, if and when it was recovered. Federici also met Pearson in August, 1965. Federici became acquainted with MacArthur on or prior to August, 1965. Federici was trusted

---

1. MacArthur was a private person, apparently of considerable wealth, who was desirous of bringing about the return of the Ruby to the museum. While his home was in Chicago, Illinois, he spent considerable time at the Colonnades Hotel in Palm Beach Shores, Florida.

by MacArthur, Antel and Pearson. It was agreed between Pearson and Antel that the latter should request William Federici to carry the ransom money to the place where it was to be deposited. When so asked, Federici refused. Pearson and Antel next met at the Colonnades Hotel on September 1, 1965. MacArthur had insisted that Antel should be alone when he took the money to where it was to be placed. Pearson insisted that he be present. Antel and Pearson agreed to proceed together, but to let MacArthur think that Antel was going to handle the money by himself. On September 1, 1965, Pearson instructed Antel to wait with the money in his possession at the Colonnades Hotel until he had received a telephone call "at about noon" and then proceed to and along the Florida Turnpike until he arrived at the Howard Johnson Restaurant. At 12 noon of that day, Antel received a telephone call and talked with a person whose voice he was unable to identify. About 1:30 p. m. he received a telephone call from Pearson, who asked him if he was ready to go ahead. Antel replied it would take him about 10 minutes to go to the Bank and get the money. Antel informed Federici and MacArthur that everything was ready and went to the Bank and received the money. It was in $100 and $50 bills and a record had been made of the number of each bill given to Antel. Upon receiving the money, Antel went to the Turnpike, entered at the Palm Beach Entrance, and traveled south. Between Exits 3 and 2 he was overtaken by Pearson in another automobile and Pearson indicated Antel should follow him. They exited at the No. 2 Hollywood Exit and proceeded on Hollywood Boulevard to a parking lot at the West Hollywood Elementary School. Antel, in compliance with Pearson's hand direction, there left his own automobile and entered Pearson's. They then proceeded in Pearson's automobile to a U-Tote-Em Store on Pembroke Road. While so proceeding, Pearson asked Antel if he had the money and Antel answered yes. Antel then called MacArthur by a telephone at the store, and in accordance with Pearson's instruction told MacArthur to proceed with Federici to the Palm Beach Service Center, where they would find two sets of telephone booths, one on the west side and one on the east side, and to wait at the booths at the east side for a telephone call. The telephone operator asked Antel to give her the number from which he was calling. At Pearson's direction, he gave her an incorrect number, transposing the last two digits of the correct number. Pearson and Antel then proceeded to the Sears Northside Shopping Center in North Miami. They called both telephone booths at the Palm Beach Service Center and at first were unable to get answers. The operator again asked them to give the number from which they were calling, and at Pearson's direction Antel again gave an incorrect number by transposing the last two digits of the correct number. Finally they got an answer to their call from Federici. Following Pearson's instructions, Antel told Federici over the telephone to reach up over a ledge inside the telephone booth and see if he could find anything. Federici soon answered, "I've got it. I've got it." Antel then advised Federici that he and Pearson would call him again at the Colonnades Hotel. MacArthur and Federici then proceeded to the Colonnades Hotel, where they contacted a jeweler who weighed and examined the recovered stone and satisfied himself it was the genuine Ruby and so advised MacArthur and Federici.

Pearson and Antel went to the Park Lane Cafeteria. They called the Colonnades Hotel, but did not receive any answer from MacArthur or Federici. They then proceeded to the Burger King Drive In at 36th and 31st Streets, where Antel, with Pearson standing at his side, called MacArthur by telephone at the Colonnades Hotel. In responding to the call, MacArthur and Federici told Antel that they had recovered the genuine stone and to release the money. When Antel told Pearson of that direction, the latter said "That's wonderful."

Pearson then made a call at the Burger King, but there was so much street noise that Antel was unable to hear what Pearson said in that conversation. Pearson and Antel then proceeded to the Howard Johnson Restaurant, parked Pearson's car, and went inside. When they got inside, Pearson instructed Antel to sit with his back to the parked Pearson car. Pearson sat facing Antel, so he could observe the car.

Before entering the restaurant, Pearson requested Antel to check the money and see if all of the bills were there and that there were no fillers in the rolls. After satisfying themselves that the full $25,000 was in Antel's hands, they placed the money in a shopping bag and placed the bag on the floor of the car in such a way that the upper portion of it was visible to one looking in from the outside.

After waiting in the restaurant for a short time, they returned to Pearson's automobile and observed that the bag containing the money was gone.

The ransom fund consisted of $15,000 in $100 bills in one package and $10,000 in two packages of $50 bills, aggregating $25,000. The day following the recovery of the Ruby and the payment of the $25,000 therefor, Pearson paid with 11 $50 bills the rental charges on an automobile. The person receiving the money noted that the roll of bills was large and that the money removed therefrom did not appear to appreciably reduce its size. On the same day, Pearson paid another bill of $400 with large bills. On September 28, 1965, several hundred dollars in bills were found in Pearson's possession and by the numbers on the bills they were identified as part of the bills turned over by MacArthur to Antel and used in payment of the ransom.

Antel kept the F. B. I. informed of his activities with respect to efforts to recover the Ruby, but he was not authorized to act for the F. B. I. and he never represented to anyone that he was so doing. Indeed, the F. B. I. advised him that they were not in a position to furnish him any protection, and that he would be arrested if he did anything illegal.

Pearson's trial began on December 8, 1965. At the end of the first day of the trial, the trial judge admonished the jury not to communicate with anyone concerning the case, not to form any opinion until it was submitted to them, and not to read, listen to, or observe any news stories on television broadcasts relating to the case, the defendant, or other persons involved. The following morning, counsel for Pearson moved for a mistrial, predicating his motion on a story appearing in a local newspaper the previous evening, which stated that Pearson had been convicted of another offense than the one on which he was being tried. The trial judge reminded the jury of his previous admonition and inquired whether any juror had disobeyed. Hearing no response, he denied the motion. A further request that the jury be asked whether any member received home delivery of the newspaper was denied. At that point two jurors indicated they had heard a "snatch" of a television news report or had a newspaper story pointed out to them. Such jurors indicated, however, that they had no conscious recollection of the contents of such stories.

At the close of the second day of the trial, the trial judge repeated the same admonition he had given on the first day. The following morning, counsel for Pearson again moved for a mistrial, predicating it on articles appearing in two newspapers distributed the previous evening. The court reminded the jurors of his previous admonition and inquired whether any jurors had read the newspapers. The jurors replied in the negative and the motion was denied. At the close of the evidence, counsel for Pearson moved the court to direct the jury to return a verdict of not guilty. That motion was denied.

Counsel for Pearson assert that the evidence established the Ruby was not moving in interstate commerce on the date the indictment alleged the offense was committed.

We have heretofore pointed out that the great value of the Ruby lay in its magnificent star; that its identity could not be concealed without endangering destruction of the star; and that it was valuable only as a collector's item or museum piece. Hence, a thief could not readily dispose of the Ruby by sale.

 We hold it is reasonable to infer from the evidence that the Ruby was transported from New York City to Palm Beach County, Florida, as a part of an unlawful and integral scheme to there exchange it for a ransom. We do not think the statute requires proof that the acts made penal by the statute must follow immediately the cessation of movement of the vehicle of transportation. We think the requirements of the statute are satisfied if the transportation in interstate commerce and one or more of the acts prohibited by the statute are so tied together as to constitute an integral scheme. Here, the evidence warranted the jury in finding that the holding and delivery of the Ruby for ransom was part of such a scheme and was so connected in time and place with the transportation as to be a part of it.[2]

We conclude there was substantial evidence of the interstate commerce element of the offense charged.

 We further conclude there was substantial evidence from which the jury could have found the facts in the case narrated above and that such facts and the inferences reasonably deductible therefrom afford adequate and substantial support for the jury's verdict.

The contention that the court should have found entrapment as a matter of law is not well founded. The law with respect to the defense of entrapment is well stated by this court in Rodriguez v. United States, 5 Cir., 227 F.2d 912, 913, 914. In the opinion in that case the court said:

" 'The gist of the defense of entrapment is the conception of the crime by the government's agent for the purpose of prosecuting the defendant, the latter not having any previous intention to commit it.' Hamilton v. United States, 5 Cir., 1955, 221 F.2d 611, 614. The accused must have been an innocent person whom the Government seeks to punish for an offense 'which is the product of the creative activity of its own officials.' Sorrells v. United States, 1932, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413. Our statement in Demos v. United States, 5 Cir., 1953, 205 F.2d 596, at page 599, (a case involving somewhat analogous facts) throws light upon this subject:

" 'For the offense to originate in the mind of the defendant, it was not necessary that the defendant be the instigator of the particular sale or act, but only that she have the general intention to commit such an offense whenever the opportunity offered.'

It is not important, therefore, that the Government sets the stage and provides the aid, incentive and opportunity for the commission of the crime, for the defense of entrapment fails unless it appears that the defendant has

---

2. United States v. Rocco, D.C.W.D.Pa., 99 F.Supp. 746, 748, aff'd. Rocco v. United States, 3 Cir., 193 F.2d 1008; Schwachter v. United States, 6 Cir., 237 F.2d 640, 644, where the indictment charged a violation of 18 U.S.C.A. § 2313. The language of that statute and 18 U.S.C.A. § 2315 is substantially the same, except the former covers only motor vehicles and aircraft and the latter covers goods, wares, or merchandise, securities, or money. Both use the phrase "moving as, or which is [§ 2315 'are'] a part of, or which constitutes [§ 2315 'constitute'] interstate or foreign commerce."

In Schwachter v. United States, supra, at page 644, the court said: "It is recognized that the interstate movement of a car does not necessarily cease when the car stops and transportation of it into the other state ends. The sale thereafter may be an incident to the theft and transportation and so tied up with it as to constitute the final step of a continuous unlawful scheme."

See further: McNally v. Hill, 3 Cir., 69 F.2d 38, 40, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238; Browder v. United States, 5 Cir., 292 F.2d 44, 49.

done that which she would never have done had it not been for the urgings and encouragements of the Government's agent."

 Entrapment does not result from an act of inducement by a private citizen.[3] Antel was not an agent or employee of the F. B. I. He was acting as a private person.

■ Moreover, Pearson, not Antel, first suggested an effort on Pearson's part to recover the Ruby on a *quid pro quo* basis, and Pearson, thereafter, by his actions and by his conversations, both with Antel and Maline, showed a complete willingness on his part to proceed with the effort to recover the Ruby on such a basis. That was especially true after Pearson was advised a substantial sum would be paid for the return of the Ruby. Indeed, from the time that Pearson was advised that $21,000 was available, to be paid for the return of the Ruby, he took command of the matter. While Antel cooperated with Pearson, he did not induce Pearson to commit the offense. Indeed, Antel could have believed Pearson was merely an innocent intermediary interceding with the real criminals for the return of the Ruby and not, as the jury was warranted in finding, that he was a primary actor in bringing about the obtaining of the ransom money for himself and others in return for the delivery of the Ruby to MacArthur.

Finally, assuming but not deciding that there was evidence of entrapment, it at most constituted a question of fact for the jury. The court, manifesting an abundance of caution, did submit the issue of entrapment to the jury, under proper instructions, and the jury by its general verdict found there was no entrapment.

■ The record shows that the jurors, by their responses to careful inquiries by the court, followed the admonitions given them by the court and were not affected nor influenced by any news media publicity.

Affirmed.

3. Henderson v. United States, 5 Cir., 237 F.2d 169, 175; Rodriguez v. United States, 5 Cir., 227 F.2d 912; Gonzales v. United States, 9 Cir., 251 F.2d 298, 299.