396 A.2d 1286

**COMMONWEALTH of Pennsylvania**

v.

**George WILLIAMS, Appellant.**

Superior Court of Pennsylvania.

Argued June 15, 1977.

Decided Dec. 29, 1978.

Petition for Allowance of Appeal Granted April 4, 1979.

510

512

Margaret H. Poswistilo, Assistant Public Defender, Easton, for appellant.

Allan B. Goodman, Assistant District Attorney, Bethlehem, submitted a brief for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

Following a jury trial on November 19, 1975, appellant was convicted of robbery[1] and conspiracy.[2] Post-trial motions were denied, and a sentence of two to four years imprisonment plus payment of the costs of prosecution and of restitution was imposed. Eight issues are raised in the instant appeal.

1.  18 Pa.C.S. § 3701.

2.  18 Pa.C.S. § 903.

In October of 1974, police in Easton, Pennsylvania, initiated surveillance of a third-floor apartment at 922 Washington Street in that community. The police had information linking Carl Brown, a prison escapee, to this residence, and they possessed warrants for Brown's arrest for armed robbery and prison breach. Late in the evening of October 17, and early on October 18, the eighth and ninth days of their observation, the officers saw a man and woman come to the apartment and join Henry Curtis James, the lessee, and his female companion. Two other males arrived separately within approximately the next two hours. When the last man to arrive, later identified as Brown, took off his coat, he was seen to be armed with a large hand-gun carried in a shoulder holster. The officers next saw two other men, later identified as appellant and Hugh Pace, changing clothes. Carl Brown took a brown paper bag from beneath the sink and tucked it into his belt. The trio then began to don their coats, apparently in preparation to leave the apartment. At this point, two members of the surveillance team attempted to reach the street in time to follow the three men, but were unable to do so. The officer who remained at the surveillance point saw the direction in which the men proceeded.

About ten minutes later, the three men came running back to the front porch at 922 Washington Street. Two of the men hurriedly attempted to unlock the front door, while the third looked up and down the street, saying, "Hurry up, hurry up, the cops are all over the place." At this point, the observing officer had his first clear view of the man's face and identified him as Carl Brown. Shortly after the three men re-entered the apartment, the officer radioed the chief of police that Brown had appeared. Immediately thereafter, the officer received a radio dispatch that an armed robbery had just occurred at Pete's Bar, approximately a block and a half from the scene. Before leaving his surveillance point, the officer saw Pace and appellant change their clothes, while Brown removed only his jacket and hat.

Based on the observations of the surveillance party and the information regarding the robbery, the police concluded that Brown and his companions were the robbers and proceeded to surround the apartment. Brown was subsequently shot and killed while attempting to flee. Pace and appellant were arrested in the hallway immediately outside the apartment. Upon entering the apartment, the police found numerous items of evidence in plain view: one wallet on a windowsill and another on the floor, a brown paper bag containing change lying on the floor, currency stuffed into a partially open drawer beneath the kitchen table, and numerous articles of clothing. This evidence was held admissible following a pre-trial suppression hearing, but that ruling was later overturned by the court en banc, which reversed appellant's first conviction and granted him a new trial.

The first point of error appellant asserts regarding his second trial is that all evidence stemming from the warrantless surveillance of the apartment at 922 Washington Street should have been suppressed. It is argued that police use of binoculars and a "startron" to conduct their surveillance from the third floor of a building forty to fifty feet from the subject premises constituted an unconstitutional search. The startron is a device which enables the observer to see into areas which would appear dark to the naked eye or through conventional binoculars. The location of the police surveillance team accorded them a view of the living room window and the kitchen window of the third-floor apartment. A portion of the bedroom could be seen through the living room window when the bedroom door was open. Neither window had curtains or shades.

It is contended that the third-floor location of the apartment gave the occupants a legitimate expectation of privacy as to activities occurring therein. Appellant relies upon *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as supporting his position that the surveillance in this case constituted a search. In *Katz*, government agents attached a listening and recording device to the outside of a public telephone booth to secure evidence of the suspect's

transmission of wagering information by phone. The United States Supreme Court there stated that "the Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States, supra* at 351–52, 88 S.Ct. at 511.

The Court further pointed out that prior case law indicating that no search could take place without physical trespass or the seizure of material objects, was no longer viable. In sum, the Court held that the government's actions violated the defendant's legitimate expectation of privacy and constituted a search which was in violation of constitutional requirements because no warrant had been obtained.

We must initially decide if the police surveillance in this case was a search under *Katz*. The decision in *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied*, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), is instructive on this question. In *Hernley*, an FBI agent received information which led him to suspect that football gambling forms were being printed in the appellant's printshop. One evening, the agent noticed that the presses in the shop were operating, but he was unable to observe any activity within the building because of the height of the windows. To solve this dilemma, the agent employed a four foot ladder which he placed on the railroad tracks abutting the appellant's property, thirty to thirty-five feet from a shop window. From this vantage point the agent, using binoculars, was able to see betting sheets being produced. Analyzing the appellant's fourth amendment claim, the *Hernley* court first noted that the use of binoculars to make visual observations was not unreasonable, citing *Johnson v. State*, 2 Md.App. 300, 234 A.2d 464 (1967), and *Fullbright v. United States*, 392 F.2d 432 (10th Cir.), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968). Recognizing that *Katz* had eliminated the necessity that a physical trespass

occur in order for a surveillance to be unreasonable, the court turned to the two part standard expressed in Justice Harlan's concurring opinion in *Katz*: (1) that the subject had demonstrated an actual expectation of privacy, and (2) that society be able to view this expectation as reasonable. Applying this test to the facts, the court held as follows:

> "Our case presents the situation in which it was incumbent on the suspect to preserve his privacy from visual observation. [Footnote omitted]. To do that the appellees had only to curtain the windows. Absent such obvious action we cannot find that their expectation of privacy was justifiable or reasonable. The law will not shield criminal activity from visual observation when the actor shows such little regard for his privacy." *Commonwealth v. Hernley, supra*, 216 Pa.Super. at 182, 263 A.2d at 907. *See also Commonwealth v. Busfield*, 242 Pa.Super. 194, 363 A.2d 1227 (1976).

We find that although there are significant factual differences in the cases, appellant's fourth amendment claim is controlled by the reasoning in *Hernley*. It is contended that the third-floor location of the apartment entitled the occupants to a greater expectation of freedom from observation. The surveillance in question, however, took place from a location on the third floor of a residence directly across from the apartment building. The susceptibility of the apartment to observation from this location was apparent. In *Hernley*, on the other hand, there was no obvious point from which observation could take place, necessitating the use of an outside instrumentality, the ladder, to make the surveillance possible. Considering all the factors advanced by appellant—the location of the apartment, the duration of the surveillance, the use of binoculars and of the startron—it remains irrefutably clear that just as in *Hernley*, the occupants of the apartment could have precluded all observation by the simple expedient of curtaining or otherwise covering the windows. Applying the standard of a balancing of interests between the security of public order by detection and prevention of crime and a person's immunity from police

interference into his privacy, *Commonwealth v. Hernley, supra,* we find that the surveillance in this case did not violate appellant's fourth amendment rights.

Appellant maintains that the use of a startron as a part of the surveillance herein violated the apartment occupants' reasonable expectation that their activities in unlit rooms at night would be private. For two reasons, we are not persuaded by this argument. First, the use of curtains or other window coverings would have rendered the startron, as well as more conventional techniques of observation, ineffective. Second, none of the evidence of which appellant complains was gained by use of the startron. The observation of the apartment on the night of the robbery took place through the use of binoculars and the naked eye. Thus, even were we convinced that use of the startron could not be sustained on these facts, we would not be compelled to suppress the evidence of which appellant complains. The fact that some evidence gained by surveillance prior to an arrest is unconstitutionally procured does not require the suppression of evidence resulting from observations not suffering from the same defect. *See Commonwealth v. Soychak,* 221 Pa.Super. 458, 289 A.2d 119 (1972).

Appellant's second claim is that the trial court erred in allowing him to be identified by witnesses at trial. It is asserted that the courtroom setting, with appellant and his attorney seated at the defense table, was so inherently prejudicial that appellant was deprived of due process of law. The cases cited by appellant, *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), all pertain to pre-trial identification procedures. Appellant apparently would have this court require in-court lineups for identifications at trial. We can perceive no reason to effect such a sweeping change in the law of this Commonwealth. There are a number of reasons why a courtroom identification is not equivalent to a one-on-one station house confrontation or similar pre-trial

procedure. At trial, a witness is under oath and fully aware of the significance and solemnity of his action in identifying a defendant. Even more important is the fact that the witness is subject to cross-examination as to the certainty of his identification, the circumstances underlying his ability to recognize the defendant, his memory, his capacity for observation, and any other factors which might affect his reliability or the weight to be accorded his evidence. At trial, defense counsel conducted extensive cross-examination of this type. Appellant was neither unfairly prejudiced nor deprived of due process by the identifications at his trial. This claim is utterly devoid of merit.

As his third point, appellant alleges that his courtroom identification by witness Peter Shumar was tainted by a prior unconstitutionally obtained identification. Mr. Shumar, the owner of Pete's Bar, identified appellant through a one-way mirror at the police station within a few hours after the robbery. A lineup was subsequently held in a courtroom, at which time Mr. Shumar was unable to pick appellant from the group. At trial, Mr. Shumar positively identified appellant as the robber who stood by the door to his establishment during the crime. The police station identification in this case was of the type condemned in *Stovall v. Denno, supra,* and *Commonwealth v. Mackey,* 447 Pa. 32, 288 A.2d 778 (1972). The victim was confronted with a single suspect in a highly suggestive setting. No counsel for appellant was present at this proceeding, and the record reveals no exigent circumstances justifying the failure to conduct a formal lineup.

In *United States v. Wade, supra,* it was claimed that the trial court's ruling allowing an in-court identification by a witness who had previously identified the appellant at an uncounselled pre-trial lineup was error requiring reversal. The test applied by the Court was "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States*

*v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. at 1939, *quoting Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The following factors are set forth as relevant to this determination:

> "[T]he prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *United States v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. at 1940.

In the instant case, the witness, Shumar, testified that he was standing in the rear of the thirty feet by sixteen feet barroom when the three robbers entered, that the lighting in the bar was good, that appellant stood by the door, that appellant's head and face were uncovered, and that the robbery lasted three to four minutes. The witness thus had a good opportunity to observe, during the criminal act, the person he identified as appellant. Mr. Shumar further stated that he was not asked for and did not give a particularized description of the robbers to the police who came to investigate following the incident. He related only that the bandits were three black males, one with a gun and a hat, and that all three were wearing jackets. There was no conflict between the information given to the police by Mr. Shumar and appellant's actual description. Mr. Shumar never identified anyone other than appellant as the member of the robbery trio who stood by the door.

On one occasion several weeks after the incident during a lineup conducted in a large courtroom, Shumar was unable to identify appellant as one of the participants in the robbery. The lineup consisted of seven to ten black males. Fifty to one hundred people viewed the proceeding from the spectator section of the courtroom. Mr. Shumar was seated about twenty rows back in the room. The lineup participants, however, were highly uncooperative. Each man was

to take a turn putting on a hat and repeating certain words, but some would not do so. The men refused to stay in line, and at different times individuals had to be restrained or removed. Mr. Shumar testified that the attempted lineup achieved no more than utter confusion, and that he felt that the chaotic nature of the proceeding may have resulted in his being unable to identify appellant on that occasion.

Under the above circumstances, we find that "the totality of the circumstances affecting the witness's identification did not involve a substantial likelihood of misidentification [citations omitted]," *Commonwealth v. Fowler*, 466 Pa. 198, 203, 352 A.2d 17, 19 (1976), and the trial court's decision to allow the in-court identification was not error. The witness was subjected to intensive cross-examination as to the details of appearance and dress of appellant and his two confederates. Any weaknesses in Mr. Shumar's powers of observation and recall were certainly exposed to the jury. Considering the positive and unshaken nature of the witness's identification, the opportunity and conditions for observation at the time of the crime, and the witness's reasonable explanation of his one previous failure to identify appellant, there was a sufficient basis to find that Mr. Shumar's ability to identify appellant was independent of the improper, suppressed confrontation.

As his fourth issue, appellant asserts that he was arrested without probable cause, and thus all evidence gained directly or indirectly through his arrest should have been suppressed. Appellant argues that the police must have relied on the radio dispatch regarding the robbery of Pete's Bar in reaching their determination of probable cause to arrest the occupants of the apartment. Appellant recognizes that hearsay information as transmitted in a radio broadcast may be considered in testing probable cause. It is asserted, however, on the authority of *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), and *Commonwealth v. Cruse*, 236 Pa.Super. 85, 344 A.2d 532 (1975), that because the Commonwealth failed to produce the radio dispatcher to testify concerning the source of his

knowledge, the information contained in the broadcast cannot be considered in determining probable cause and the arrest must fail.

"It is well established that a police officer is authorized to arrest without a warrant when he has probable cause to believe that a felony has been committed and that the person to be arrested is the felon. *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Commonwealth v. Jackson*, 450 Pa. 113, 299 A.2d 213 (1973); *Commonwealth v. Vassiljev*, 218 Pa.Super. 215, 275 A.2d 852 (1971). Probable cause to justify a warrantless arrest exists if the facts and circumstances known to the officer at the time of the arrest would warrant a prudent man in believing that an offense had been committed, and the suspect was the perpetrator of that offense. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Commonwealth v. DeFleminque*, 450 Pa. 163, 299 A.2d 246 (1973); *Commonwealth v. Brown*, 230 Pa.Super. 214, 326 A.2d 906 (1974)." *Commonwealth v. Jones*, 233 Pa.Super. 461, 464, 335 A.2d 789, 790–91 (1975).

The authority cited by appellant does not require that we find a lack of probable cause to support the warrantless arrest in this case. Both *Whiteley* and *Cruse* were cases in which the arrest of suspects was based *solely* on information received over police radio broadcasts. In the instant case, Detective Beers, one of the officers conducting the surveillance of the apartment, saw three men enter and change clothes. One of the men carried a large pistol in a shoulder holster. Officers saw the men leave the apartment and were able to note the direction in which they proceeded. The trio ran back to the apartment within ten minutes. The men hurriedly attempted to gain entrance to the apartment building. The man carrying the gun urged the others to, "Hurry up. The cops are all over the place." At this time, Detective Beers recognized the speaker as Carl Brown, the object of the surveillance and the man for whom the police had arrest warrants on robbery and escape charges. The

officer radioed for help to effect the capture of Brown. Turning to the alternate police channel, he received a broadcast regarding the robbery of Pete's Bar. The broadcast related the time of the incident, that the robbers were three black males and that one was wearing a black hat, a brown coat and carrying a large pistol. Detective Beers knew that Pete's Bar was only a block and a half from the apartment, in the direction the three men had taken when they left and from which they returned. With this knowledge, Detective Beers made another radio call stating that he believed the apartment harbored not only Carl Brown, but the perpetrators of the just-completed robbery. Detective Beers' conclusion that probable cause existed to arrest the three men in the apartment was strongly supported by his personal observations. What the officer knew about the appearance and actions of the men immediately preceding and immediately following the time of the robbery matched the information the police radio conveyed. A finding of probable cause was thus not based solely on the hearsay broadcast, but on that information as buttressed and substantiated by the officer's personal knowledge. *See Commonwealth v. Jones*, 457 Pa. 423, 322 A.2d 119 (1974); *Commonwealth v. Hines*, 230 Pa.Super. 290, 326 A.2d 485 (1974). This combination was clearly sufficient to support a reasonable belief that appellant and his cohorts were the robbers of Pete's Bar.

It is also important to note that the disposition of this issue is not altered by the fact that Detective Beers was not inside the apartment when appellant and Hugh Pace were arrested. The detective had radioed his belief that the robbers were inside the apartment to the officers, who soon thereafter made the arrests. The arresting officers were certainly entitled to rely on this radio bulletin. Moreover, Officer Beers appeared at trial, testified and was available for cross-examination as to the facts and circumstances on which his conclusion was based.

Appellant's fifth claim is that two exhibits were improperly admitted into evidence at his trial. The first of these was the gun found beside the body of Carl Brown. It

is maintained that this exhibit was obtained as the result of appellant's illegal arrest. Because we have determined that the arrest was lawful, appellant cannot prevail on this issue. Appellant also contends that a wallet found in the purse of Miss Zoe Ann Gibbons, who was arrested along with the other occupants of the apartment, should have been suppressed because it was irrelevant to appellant's guilt or innocence. It was established at trial that the wallet was taken from one of the bar patrons during the robbery. "Evidence is relevant if it tends to establish some fact material to the case or tends to make facts at issue more or less probable." *Commonwealth v. Hickman,* 453 Pa. 427, 433, 309 A.2d 564, 567–68 (1973). Here, appellant, Brown and Pace had been in the same apartment with Miss Gibbons both before and after the robbery. No other persons entered the apartment during this interval. The presence of the wallet in Miss Gibbons' purse obviously linked the three men with the robbery. This claim is thus without merit.

Appellant's sixth assignment of error concerns ten instances of alleged hearsay testimony. Eight of the ten statements took place during appellant's suppression hearing. We have previously noted that hearsay may be properly considered as relevant to probable cause, which was the principal issue in the suppression proceeding. Further, six of the utterances, including one of the two which occurred at trial, were offered not for their truth but only for the fact that they were made, and were thus not excludable as hearsay. *Commonwealth v. Ricci,* 332 Pa. 540, 3 A.2d 404 (1939). Two of the four remaining statements which are assailed were merely cumulative of evidence from other sources, the admissibility of which is not questioned. The final two instances, which we have not yet addressed, are as follows. First, at the suppression hearing, Detective Beers was permitted to say that the coroner had removed money from the body of Carl Brown. Second, Detective Beers was allowed to testify at trial that he had permission to be on the property from which the surveillance was conducted. Appellant maintains that the latter statement was particu-

larly damaging because the Commonwealth did not introduce any direct evidence of the right of the police to occupy the surveillance point. It was thus not established, he argues, that the police were not trespassing on the property of the apartment lessee when they conducted the surveillance. According a common sense consideration to the testimony and all the evidence produced, we find this claim to be devoid of merit.

Upon extensive examination and analysis of the record in this case and particularly of the testimonial utterances of which appellant complains, we find that the few instances in which hearsay testimony was erroneously allowed constituted, both singularly and cumulatively, harmless error. We are well aware of the stringent standard required in the application of this doctrine.

> "[T]he proper standard for determining whether an error involving state law is harmless is the same as the standard this Court applies to federal constitutional error: an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. [Footnote omitted]." *Commonwealth v. Story*, 476 Pa. 391, 405–06, 383 A.2d 155, 162 (1978).

Thus, whether we view this issue as a claimed violation of appellant's right to confrontation under the sixth amendment or as a matter of state evidentiary law, "an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless. *Commonwealth v. Davis*, 452 Pa. at 178, 305 A.2d at 719, *quoting Chapman v. California*, 386 U.S. 18, at 24, 87 S.Ct. 824, at 828, 17 L.Ed.2d 705." *Commonwealth v. Story, supra* at 409, 383 A.2d at 164. Applying this exacting test, we have determined that the instances of alleged hearsay testimony raised by appellant, where they constituted error, were harmless beyond a reasonable doubt.

Appellant's seventh issue is his contention that he was denied his right to a speedy trial and subjected to

double jeopardy by the actions of the court en banc. It is reasoned that because the court granted a new trial based on only one of appellant's post-trial motions and did not decide his other claims, appellant was potentially subject to further retrials and long delay in the ultimate resolution of his case due to the assumed repetition by the trial court of its alleged former errors. *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), which appellant cites in support of his position, is clearly inapposite, as it involves the trial court's sua sponte declaration of a mistrial. Rather, this claim is controlled by the rule set forth in *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), that the double jeopardy clause does not bar retrial following a successful appeal. Thus, the Court has made clear that a successful appeal from conviction on any ground other than the insufficiency of the evidence poses no bar to further prosecution on the same charge. *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); *Commonwealth v. Hogan*, 482 Pa. 333, 393 A.2d 1133 (1978). Appellant's argument on this issue is patently without merit.

Appellant's final contention is that the trial judge erred in refusing to grant a mistrial when one juror admitted that he had read and discussed a newspaper article concerning the trial with another juror. At the trial's commencement, the court cautioned the jury not to consider any matter not in evidence, and not to read any newspaper articles concerning the trial or the defendant. During the trial, an article appeared in the local paper which summarized testimony of the previous day. Included therein was a statement that the defendant had been convicted previously on the same charges, but that he was awarded a new trial because the judge "ruled that police had conducted an improper search of the apartment where they arrested [appellant. The judge] said some evidence collected during the search could not be used against [appellant]." When defense counsel had the article marked as an exhibit, he moved for a mistrial. The trial judge asked if anyone had read the article, and when one juror indicated that he had, the court questioned

him out of the hearing of the other jurors. That juror indicated that he had mentioned the article to a second juror only to point out to him an error in the reported testimony. Both jurors were asked if the article had in any way affected their attitudes toward the case, to which they replied in the negative, the second juror reaffirming that he had not read the article. The court asked: "You can decide the case based solely on the evidence that you heard in the courtroom under cross-examination and not in any way influenced by the fact that you read this article?" Both jurors reaffirmed their abilities to do so.

It is well settled that the right to trial by jury includes a guarantee that the accused will get a fair trial before a panel of impartial jurors. *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). A jury's verdict must be based upon evidence presented in the course of the trial, not on extraneous commentary presented in the forum of public opinion by news media. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). If a juror's decision is influenced by inflammatory news reports, an accused has been deprived of a fair trial and due process requires reversal of the conviction. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

In *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976), prejudicial publicity had occurred during trial. Several newspaper articles and radio spots disclosed the appellant's confession, earlier suppressed because violative of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court refused to question the jurors and denied sequestration. Rather, the court gave several general cautionary instructions. The supreme court found that no meaningful effort had been made to secure an unprejudiced jury panel. The appellant was accordingly awarded a new trial. The *Bruno* court observed:

"When there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action. Although the proper precautions are inevitably dictated by the circumstances of each case,

they must reasonably ensure that no prejudice will occur." 466 Pa. at 266, 352 A.2d at 51.

In the instant case, the objectionable part of the newspaper account was a factual reference to a previous conviction on the same charges then before the jury. There was no opinion expressed as to appellant's guilt or innocence; there was no specificity as to the improperly seized evidence. Unlike the *Bruno* confession, the challenged information was not inherently prejudicial, but was ambiguous at most.[3] It revealed that appellant was previously convicted, but it cast law enforcement officials in a negative light by revealing their improper investigative activities, sufficiently illegal as to require a new trial. The court below questioned the jurors to be sure that no prejudice would result. Furthermore, the part of the article with which the juror showed concern was not the questioned reference, but a misstatement of testimony. The jury was finally cautioned to reach its verdict based solely upon matters in evidence and not to be influenced by any outside information.

Under the circumstances of this case, it is clear that the court took adequate cautionary measures to ensure that no prejudice occurred to appellant. This is all that due process requires. Accordingly, we find no abuse of discretion in the lower court's refusal to grant a mistrial. Our decision is in accord with other federal and state decisions in which publicity during trial was not grounds for a new trial when jurors were questioned, cautioned, and reaffirmed their abilities to decide the case before them free of any outside influence or prejudice. *See e. g., Pearson v. United States,* 378 F.2d 555 (5th Cir. 1967); *People v. Pisarski,* 6 Ill.App.3d 235, 285 N.E.2d 551 (1972); *People v. Smith,* 34 Mich.App. 205, 191 N.W.2d 392 (1971).

Judgment affirmed.

3. As noted in *United States ex rel. Dessus v. Commonwealth of Pennsylvania,* 316 F.Supp. 411 (E.D.Pa.1970), *cert. denied,* 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972), when challenged publicity is not inherently prejudicial, the burden rests on the defendant to show identifiable prejudice.

SPAETH, J., files a dissenting opinion in which CER-CONE, J., joins.

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, dissenting:

According to the record, when the police saw the fugitive Carl Brown, the gun in the shoulder holster, the brown paper bag, and the other defendants changing their clothes in preparation for the robbery, the lights in the apartment were on. (N.T. 266, 279) In other words, none of the evidence was seen by means of the startron, but instead by binoculars and the naked eye. I therefore cannot say that the evidence was improperly admitted. Nevertheless, I disagree with the majority's conclusion that the people in the darkened apartment had no reasonable expectation of privacy.

The majority states:

Considering all the factors advanced by appellant—the location of the apartment, the duration of the surveillance, the use of binoculars and of the startron—it remains irrefutably clear that just as in *Hernley*, the occupants of the apartment could have precluded all observation by the simple expedient of curtaining or otherwise covering the windows.

Majority opinion at 1291.

By this statement the majority seriously erodes the concept of Fourth Amendment privacy; it informs the citizens of this Commonwealth that when they retire to their bedrooms and turn out the lights, they must not open their curtains, unless they are willing to have their most intimate moments the subject of scrutiny by the police.

I am not predicting the erosion of privacy; it has occurred; and the majority has sanctioned it. One of the police officers testified as follows:

Q  Officer, I refer you now to the night of October 17, 1974. At what time did you arrive at 922 Washington Street to conduct your surveillance then?

A  I arrived at my location point for the surveillance about eight o'clock.

Q  Yes. Excuse me. What did you do at eight o'clock there?

A  What—started taking up the surveillance.

Q  What did you do?

A  Went to the third floor and started watching the apartment.

Q  What did you see?

A  I saw Henry Curtis James and at that time she was unknown Negro female.

Q  Were the lights on or off?

A  May I refer to my report, please?

Q  Were the lights on or off?

A  The lights were on at one time during that period, but they were off. The television was on.

Q  What were Mr. James and the unknown female doing?

A  Engaging in sexual activities.

Q  Were they dressed or undressed?

A  Undressed.

Q  For how long did this continue?

A  I don't recall, fifteen, twenty minutes, I believe.

(N. T. 230–231)

After a discussion at side bar the officer continued:

Q  How long did this activity continue?

A  From the time of my beginning the surveillance, there was a time that they were engaged in sexual activity and there was a time that they were just there. I can't give you specific times that this man and this girl engaged in those activities.

Q  Did someone interrupt? Did someone approach the house?

A  Oh, eventually, later on.

Q   At what time, or approximately fifteen, twenty minutes?

A   Approximately the first person that came that night was George Williams and the girl he was with.

Q   Did Mr. Williams have a key?

A   No.  He did not.

Q   How was Mr. Williams given entry to the apartment?

A   George Williams and his girl stood on the front porch. They rang a doorbell.  There's doorbells on the front and I assume they rang a bell.  We could see that the persons upstairs—apparently, the bell didn't ring or they didn't hear it because they just still sat there.  A couple of minutes went by, maybe close to five, and then, finally, again Mr. Williams pushed the button and the girl jumped up and ran into a bedroom, which I told you before, and Henry Curtis James, who was the Negro male there, came downstairs and allowed them entry.

Q   When Mr. James came to the door, was he dressed or undressed?

A   He had a pair of jeans on.

Q   When had he put on those jeans?

A   Put those jeans on when the bell rang—I would have to assume the bell rang.

(N.T. 234–235)

It is plain that the two people involved in this incident wished privacy.  In my opinion they were reasonable in believing that when they had turned out the lights, they had secured privacy.  On the civil side, liability has been imposed for intrusions comparable to the officer's in this case.  *See Hamberger v. Eastman*, 106 N.H. 107, 206 A.2d 239 (1964) (civil liability in tort for invasion of privacy where landlord places listening devices in married tenants' bedroom).  *See generally* Prosser, Handbook of the Law of Torts, § 117 (West ed. 1971).

Contrary to the apparent belief of the majority, the individual's right of privacy is not subordinate to the intrusive capabilities of the police. We may be assured that "the fantastic advances in the field of electronic communication," *Lopez v. United States*, 373 U.S. 427, 441, 83 S.Ct. 1381, 1389, 10 L.Ed.2d 462 (1963) (WARREN, C. J., concurring), will continue. According to the majority, it is the individual's burden to protect himself against such advances; let him adopt "the simple expedient", says the majority, "of curtaining or otherwise covering the windows." Accept this argument, and our privacy is gone, for soon the police will be able to see through our curtains, and our walls too. As one commentator has noted:

> Most present building materials, such as wood and brick, are as opaque to infrared radiation as they are to visible light. However certain substances in widespread use, such as plastics, are excellent transmitters of infrared energy even when painted and thus opaque to visible light. To a lesser extent glass and derivative materials such as fiberglass also transmit infrared radiation. The day may soon arrive when the infrared emanations from a human body, passing through the four walls which have traditionally afforded privacy from visual intrusions, can be detected and reconstructed into a television picture by a nearby snooper. Such a development would remove the last barrier to unwanted visual observation of private areas.

> Note, Electronic Visual Surveillance and The Fourth Amendment: The Arrival of Big Brother?, 3 Hast.Const. L.Q. ——, 269 (1976) (footnote omitted)

What "simple expedient" will the majority recommend then?

I recognize the public policy favoring the advancement of the ability of the police to detect and prevent crime. However, I also recognize, as the majority does not, that the privacy of the home is a right guaranteed by the Fourth Amendment of the Constitution; it is not a mere privilege

subject to destruction at the hands of the state. *See Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).[1] The framers of the constitution did not intend that we should be driven to our cellars, there to communicate by passing notes. As one noted commentator has observed:

> [A]nyone can protect himself against surveillance by forebearing to use the phone; and so far as I am presently advised of the state of the mechanical arts—anyone can protect himself against surveillance by retiring to the cellar, cloaking all the windows with thick caulking, turning off the lights and remaining absolutely quiet.

Amsterdam, Perspectives on the Fourth Amendment, 58 U.Minn.L.Rev. 349, 402 (1974).

In *Lorenzana v. Superior Court of Los Angeles County*, 9 Cal.3d 626, 636, 108 Cal.Rptr. 585, 593, 511 P.2d 33, 41 (1973), the California Court of Appeals said:

> Surely our state and federal Constitutions and the cases interpreting them foreclose a regression into an Orwellian society in which a citizen, in order to preserve a modicum

---

**1.** In *Griswold* Justice DOUGLAS, joined by three other members of the Court, held that the "various guarantees [of the First, Third, Fourth and Fifth Amendments] create[d] zones of privacy" protected from state interference by the Constitution. 381 U.S. at 484, 85 S.Ct. at 1681. In so holding, Justice DOUGLAS stated that the Fourth Amendment was a "protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.'" *Id., quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 538, 29 L.Ed. 746 (1886). *See also Mapp v. Ohio*, 367 U.S. 643, 656, 81 S.Ct. 1684, 1697, 6 L.Ed.2d 1081 (1961) (Fourth Amendment creates "right to privacy"). One possible effect of the contraceptive law held invalid in *Griswold*, according to Justice DOUGLAS could have been the difficulties of enforcement, specifically the possible invasions of privacy caused by the police searches for evidence. With respect to this possible problem he stated:

> Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the [marital] relationship.

*Id.* 381 U.S. at 486, 85 S.Ct. at 1682.

The use of a startron to peer into a darkened bedroom at night is even more repulsive to the notions of privacy than a daylight search for contraceptives.

of privacy, would be compelled to encase himself in a light-tight, air-proof box. The shadow of 1984 has fortunately not yet fallen upon us.

With the majority's decision upholding the police use of the startron, "the shadow of 1984" has not "fallen", perhaps, but a few more such decisions and it will.

There is a second, independent, disagreement I have with the majority, which leads me to conclude that the disposition in this case is in error. Specifically, I dissent from the majority's decision concerning the trial judge's handling of the jurors who became aware of the newspaper article concerning appellant.

The Pennsylvania Supreme Court has stated that the "minimal standards of constitutional due process guarantee [ ] to the criminally accused a fair trial by a panel of impartial and 'indifferent' jurors." *Commonwealth v. Stewart*, 449 Pa. 50, 52, 295 A.2d 303, 304 (1972), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974). "A jury's verdict must be based upon evidence presented in the course of the trial, not on extraneous commentary presented in the forum of public opinion by news media." *United States ex rel. Dessus v. Commonwealth of Pennsylvania*, 316 F.Supp. 411, 419 (E.D.Pa.1970), *cert. denied*, 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972), *citing, Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Thus, where the juror's decision is influenced by media reports, the conviction must be reversed. *Irwin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Great care must be taken in striking the balance between the fundamental right of free press and the fundamental right to a fair trial. *See Commonwealth v. Bruno, supra.* In striking the proper balance, the trial judge has discretion to decide what procedures should be employed. *See Commonwealth v. Bruno, supra.* However, " 'our system of law has always endeavored to prevent even the probability of unfairness' ". *Commonwealth v. Stewart, supra*, 449 Pa. at

57, 295 A.2d at 306, *quoting In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

The application of these principles has led to a two step inquiry being made in cases where the accused claims that his right to a fair trial has been violated by prejudicial publicity. The first inquiry is whether the jury was aware of the publicity;[2] if it was, the second inquiry is whether that awareness prevented the jury from remaining impartial. In this case we need not make the first inquiry because one juror read the article and another was told about it. *See Commonwealth v. Santiago*, 456 Pa. 265, 318 A.2d 737 (1974) (three jurors admitted to hearing inadmissible remarks). In making the second inquiry we must examine the specific item in question in light of the corrective actions taken by the trial judge.

If the publicity is merely an accurate factual account, with no comment as to guilt or innocence, a cautionary instruction by the trial judge, that in reaching their verdict the jurors must consider only the evidence at trial, will be held to remove any element of unfairness. *See United States v. Jones*, 542 F.2d 186 (4th Cir. 1976); *United States ex rel. Dessus v. Commonwealth of Pennsylvania, supra. See also People v. Pisarski*, 6 Ill.App.3d 235, 285 N.E.2d 551 (1972) (articles were mostly factual and did not contain prejudicial information; jurors who had read articles swore that they were not affected). In this case the greater part of the news article in question was devoted to a factual summary of the evidence produced at trial and contained no comment as to guilt or innocence. Were this all, our inquiry would be complete, because there was nothing in this portion that could be said to affect the jurors' impartiality, and the trial judge properly instructed them to decide the case based

2. In some cases the publicity is so inflammatory and so massive that the court will assume that the jury was aware of it, even though no juror admits to having heard or read the item in question. *See Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978); *Commonwealth v. Bruno, supra; Commonwealth v. Price*, 463 Pa. 200, 344 A.2d 493 (1975); *Commonwealth v. Bobko*, 453 Pa. 475, 309 A.2d 576 (1973).

only on the evidence produced at trial. However, the article also contained these two paragraphs:

Williams is on trial a second time for participating in the holdup with two others, including Carl Brown who was shot and killed the same night when Easton police surrounded the trio at a Washington Street apartment.

Williams was convicted in March of participating in the robbery. However, Northampton County President Judge Clinton Budd Palmer granted Williams a new trial two weeks ago. Palmer ruled that police had conducted an improper search of the apartment where they arrested Williams. He said some evidence collected during the search could not be used against Williams.

The majority states that the information contained in these paragraphs "was not inherently prejudicial; but was ambiguous at most." Majority opinion at 1296. I find no ambiguity. The article informs the most casual reader of these facts: first, that appellant had already been found guilty of the very crime for which he was on trial; second, that President Judge PALMER had nevertheless granted him a second trial because, in the judge's opinion, the "police had conducted an improper search"—*i. e.,* in popular parlance, "because of some legal technicality"; and third, that because of this technicality, the district attorney was not going to be able to use all the evidence he had. This information was inherently prejudicial, as may be realized by reflecting that if the district attorney had made a statement to this effect at trial, a mistrial would have been required. *See Commonwealth v. Heacock,* 467 Pa. 214, 355 A.2d 828 (1976). *See also Commonwealth v. Reynolds,* 254 Pa.Super. 454, 386 A.2d 37 (1978); *Commonwealth v. Sargent,* 253 Pa.Super. 566, 385 A.2d 484 (1978); *Commonwealth v. Long,* 258 Pa.Super. 251, 392 A.2d 779 (1978). The fact that the juror read it in a newspaper instead of hearing it from the district attorney does not in any way diminish its inherently prejudicial quality. The question, therefore, is whether the corrective actions taken by the trial judge overcame the prejudicial impact of the article.

The trial judge had warned the jurors not to listen to or read any news report concerning the case. Two jurors admitted to disobeying this warning. Upon discovering this disobedience the judge questioned each juror individually and repeated his warning. This was proper procedure. *See Mares v. United States*, 383 F.2d 805 (10th Cir. 1967); *United States v. Accardo*, 298 F.2d 133 (7th Cir. 1962) (purpose of individual interviews is to overcome any reluctance jurors may have to speaking out). The jurors swore that they had not been prejudiced, and that they would decide the case based solely on the evidence produced at trial. At this point the judge had to decide whether to dismiss one or both of the jurors, or declare a mistrial, or allow the case to proceed before these jurors. *See* ABA Standards Relating to Fair Trial and Free Press, § 3.5 (Approved Draft 1968) (Commentary); *see also United States ex rel. Goodyear v. Delaware Correctional Center*, 419 F.Supp. 93 (D.Del.1976) (judge excused juror who had read news item and replaced him with alternate juror). The judge warned the jurors of their duty to remain impartial and to decide the case solely on the evidence produced at trial, and then allowed them to remain as jurors. The majority says that this was not an abuse of discretion. I disagree. Some evidence is so prejudicial that a juror's protestation that he will not be prejudiced cannot be accepted. In my opinion, that was the case here.

In *Commonwealth v. Conti*, 236 Pa.Super. 488, 345 A.2d 238 (1975), this court examined the problem of a trial judge who while sitting as a fact finder became aware of inadmissible prejudicial evidence against the defendant. Instead of adopting a general rule that a judge as someone trained in the law could be presumed to ignore inadmissible evidence, we held that each case must be decided on its facts; "judges are subject to the same emotions and human frailties as affect all persons, lay jurors or not." *Id.*, 236 Pa.Super. at 499, 345 A.2d at 244. *See Commonwealth v. Badger*, 482 Pa. 240, 393 A.2d 642 (1978) (counsel ineffective for not request-

ing trial judge to recuse himself where judge knew that defendant had earlier pleaded guilty to the charge. Thus we held that even though the judge may honestly believe that he will not be affected, there are some cases where we will nevertheless say that the evidence was so prejudicial he could not ignore it. Evidence of a prior plea of guilty to the same crime by the defendant is such evidence. *Commonwealth v. Conti, supra.*

What is true of a judge, experienced in the rules of evidence, must be even truer of a lay juror. This court has stated that "[o]ur law of evidence is the product of the need 'to shelter untrained citizens from the temptation to accept uncritically that which may be unreliable and of doubtful credibility.'" *Commonwealth v. Conti, supra*, 236 Pa.Super. at 497, 345 A.2d at 243, *quoting*, Levin and Cohen. The Exclusionary Rules in Nonjury Criminal Cases, 119 U.Pa.L. Rev. 905, 905–906 (1971). The Commentary to the ABA Standards relating to Fair Trial and Free Press discusses this precise issue:

> There will certainly be occasions when a juror's assurance of impartiality may properly be accepted, but there will be other occasions when the information is of such a character that prejudice ought to be presumed, regardless of the juror's testimony as to his state of mind.
>
> ABA Standards Relating to Fair Trial and Free Press, § 3.5 (Approved Draft 1968) (Commentary) (footnotes omitted).

In support of this recommendation the Commentary quotes the United States Supreme Court in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), where in discussing the problem of having a trial jury decide the voluntariness of a confession, the Court stated:

> If it [the jury] finds the confession involuntary, does the jury—indeed can it—then disregard the confession in accordance with its instructions? If there are lingering doubts about the sufficiency of the other evidence, does

the jury unconsciously lay them to rest by resort to the confession? . . . These hazards we cannot ignore. ABA Standards, *supra, quoting Jackson v. Denno, supra,* at 388–89, 84 S.Ct. at 1787 (footnote omitted).

The jurors here should not have been permitted to remain on the case. In *Commonwealth v. Santiago, supra,* a witness told one juror that the defendant had "killed an innocent boy and it isn't the first one he has killed." This remark was overheard by three other jurors. After individual interviews of each juror, the trial judge dismissed one juror but allowed the others to remain. In reversing, the Supreme Court stated:

> In this case the remarks heard by the three jurors would not have been admissible during the trial, and their admission over objection, would have constituted reversible error. The prejudice to the appellant is no less when the remarks are made outside the courtroom. The appellant was entitled to an impartial and indifferent jury. His motion for a mistrial should have been granted.
>
> *Commonwealth v. Santiago, supra,* 456 Pa. at 270, 318 A.2d at 740.

If evidence of prior convictions for unrelated crimes would be evidence warranting the grant of a mistrial, *see Commonwealth v. Santiago, supra,* so too must evidence of a prior conviction of the exact same crime; in fact such evidence is clearly more prejudicial than evidence of other crimes, which might tell the jury that the defendant is a bad person likely to commit crimes but does not tell the jury that the defendant had in fact committed the very crime for which he is on trial. These considerations are especially pertinent here, where the evidence of the prior conviction was aggravated by the explanation that it had been set aside because of a ruling suppressing evidence.

The judgment of sentence should be reversed and the case remanded for a new trial.

CERCONE, J., joins in this opinion.