UNITED STATES of America,
Appellant,

v.

Matthew BELLINA, Daniel David
Hochroth, and Anthony Di
Benedetto, Appellees.

No. 81–5084.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 9, 1981.

Decided Dec. 21, 1981.

Rehearing Denied Feb. 4, 1982.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S. C. (Henry Dargan McMaster, U. S. Atty., Columbia, S. C., Cameron B. Littlejohn, Jr., Asst. U. S. Atty., Columbia, S. C., on brief) for appellant.

Thomas C. Manning, Raleigh, N. C. (Cheshire & Manning, Raleigh, N. C., on brief), Jeffrey S. Weiner, Miami, Fla. (Geoffrey C. Fleck, Weiner, Robbins, Tunkey & Ross, P.A., Miami, Fla., G. Dan Bowling, Goodstein, Bowling, Douglas & Philips, Charleston Heights, S. C., on brief), for appellees.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and PHILLIPS, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is an appeal from a suppression order by the district court invalidating on constitutional grounds an airplane search. The facts are set forth in the testimony at the suppression hearing of the officers involved in the search: About one o'clock on the morning of December 3, 1980, a Piper Navajo airplane, FAA Registration N3527Q, landed at the Charleston (South Carolina) public airport and taxied to a point near the offices of Hawthorne Aviation, which operated an airplane servicing and maintenance service at the airport as well as an airplane chartering business. As it landed, the employee of Hawthorne on duty "heard a loud noise" which did not

"sound like an ordinary plane." Two men emerged from the plane and inquired of the Hawthorne employee where they could secure lodging, adding they would be back in the morning. They were not otherwise communicative. They offered no explanation of the damage to the plane nor did they request any assistance in repairing or servicing the damaged plane. The employee secured a conveyance for them to a Holiday Inn.

After the pilot and co-pilot had left the airfield, the Hawthorne employee, curious, surveyed the damage to the plane. In so doing, he used a ladder which he placed a few feet from the plane. He discovered that the tips of the propellers were broken or bent, the landing gear "heavily damaged," and "one of the wing braces had been bent as the landing gear came up," bending "one of the wing struts." As an experienced plane mechanic, he gave an opinion that "the aircraft must have some time or other taxied into a deep chuckhole or ran (sic) off the side of a runway someplace, and caused the wheel—that side of the aircraft to drop down to the point that the propeller struck the ground." He added that it was his judgment that "it was very, very unsafe for anyone to fly an airplane in that condition" and "that it probably would have an awful lot of vibration." He, also, noted that the seats had been removed from the middle part of the plane. Because of all these unusual and suspicious circumstances, the manager of Hawthorne felt he should call the Charleston office of the United States Customs Service and suggest that it investigate the plane. As a result two patrol officers, Patterson and Stott, were directed to go to the Charleston Airport to investigate. At the same time the Customs Office notified the local Drug Enforcement Administration (DEA) office and enlisted its cooperation.

Upon their arrival at the airport Officers Patterson and Stott talked to the Hawthorne employees and obtained information on the plane's appearance at the airport, the action of its pilots and the damage suffered by the plane as well as the employees' opinion on the cause of the damage.

The officers then made an independent inspection of the plane. Officer Patterson testified that, standing at a point some three or four feet from the plane, he observed through the windshield of the plane that all the seats behind the seats of the pilot and co-pilot had been removed, except two seats in the very rear of the aircraft. He deduced from this that cargo had been transported in the plane. He next stepped on a wing of the plane. The curtains on some of the windows had been partially closed but on other windows the curtains were open. He looked through one of the open windows and saw on the floor of the plane in the cargo area and also near the pilot's area what he, as an experienced officer in marijuana investigations, identified as marijuana.

Officer Stott made his investigation in a different way. He ascended the ladder which had been used by the Hawthorne employee in his survey of the plane and from which, at a distance of a few feet from the plane, he peered into the plane. He, also, saw marijuana seed in what would have been the cargo area of the plane. Although the employee at Hawthorne offered to open the plane with a key he had, the officers made no effort to enter the plane itself. Instead, they reported this information developed as a result of their investigation to their superior at the Charleston office, where the heads of the local office of the Customs Office and DEA were, following the investigation. Patterson and Stott were instructed to put the plane under surveillance for the time being and await the return of the two pilots who were supposed to return that morning.

Shortly before officers Patterson and Stott began their investigation of the damaged plane, Officer Garcia had reported to the Charleston Customs office that he had discovered twelve bales of abandoned marijuana alongside the runway of the Walterboro/Colleton County (South Carolina) airport, located about twenty or thirty miles from the Charleston airport. Officer Garcia had been informed in the course of his investigation that a plane "had been at the

airport in the middle of the night, stayed there a short time and took off again, and there was a lot of noise and problems with the plane." Garcia was then told of the "suspicious" plane at Hawthorne and instructed to join Patterson and Stott at the Charleston airport. He reached the Charleston airport about 11:00 or 11:30 that morning.

When the pilots did not return during the morning, Stein, in charge of the Charleston DEA office, began to trace the ownership of the plane. He first inquired through FAA as to the owner of the aircraft and was advised that the owner was a Dr. Moore in Jenkintown, Pennsylvania. He telephoned Dr. Moore around noon. Dr. Moore told him that, while he was the registered owner of the aircraft it was subject to a lease purchase arrangement with Aero Ventures in New Jersey which was actually in charge of the plane. Dr. Moore gave Stein the telephone number of Aero Ventures as well as the name of the president of that company. Stein telephoned Aero Ventures and asked to speak to the president of the company. He was told that the president was not there but that a Mr. Simms was in charge. When he talked to Simms he inquired about the plane. Simms told him that the plane had been leased in December for three days to Matthew Bellina, a licensed pilot with a New York address, and was due to be returned that day (December 3). Stein told him that the plane was then in Charleston, South Carolina, in a damaged condition. He specifically told Simms that the only seats in the plane were those of the two pilots and the two rear seats, adding that "the cargo area was completely empty." Simms at this point referred Stein to a Mr. Katz, an attorney and one of the owners of Aero Ventures. When Stein told Katz about the plane's condition, Katz became quite concerned about the seats which he said "were worth about $9,000" and inquired "if we had any idea where his seats were . . . ." Stein told Katz that all he could tell him was that "by looking through the windows we could tell there were no seats in the aircraft" and that the Government would like permission

to investigate further by entering the plane. Katz expressed a willingness to co-operate fully and agreed to a search of the plane. Stein relayed this information to Settles, the Director of the Customs Patrol, with the request that he instruct his officers to search the plane.

Settles did not, however, instruct his officers to search the plane, but communicated with a Mr. Murphy in the Customs Office in Philadelphia. He told Murphy the situation and requested Murphy to secure, if possible, written consent from Aero Ventures for the search. Murphy visited Simms at Aero Ventures and told him that the plane "was under surveillance in Charleston, South Carolina [and] that he believed it had been used to transport contraband." Simms showed Murphy a lease agreement under which the plane had been leased to the defendant Matthew Bellina. The terms of the lease were reviewed with Murphy by Simms. Under the provisions of the lease the plane could not be operated at night and "the lessee shall not molest or tamper with the equipment in the airplane." After communicating with his supervisor Simms signed a written consent for the search of the plane. Only after they were advised by Murphy in Philadelphia that the latter had in hand a written consent to search did Settles and Stein instruct their officers at the airport to search the plane. The search, conducted at about 4:30 in the afternoon, revealed the removal of four seats and the presence of marijuana about the interior of the plane. Following this discovery the plane was sealed by the searching officers.

About 7:30 on the evening of December 3 while the officers were still at the airport a yellow Hertz truck which had driven into the airport and up to the seized plane, suddenly was driven at great speed through a locked gate, proceeding in the wrong direction down a one-way road. After pursuit the officers overtook the truck, discovered four airplane seats in the truck, and removed two persons, the defendants David Hochroth and Anthony Di Benedetto, from it. Both were placed under arrest and, along with Matthew Bellina, were later in-

dicted and charged with violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), 960, 963 and 18 U.S.C. § 2.

Prior to any trial, the defendants made a motion to suppress any evidence seized in the search of the plane. In connection with that motion, the district court held a hearing. At the hearing, Hochroth and Di Benedetto testified; Bellina, the pilot, did not. According to the testimony of Hochroth and Di Benedetto, Bellina had been employed by them as a pilot and as their agent and with money supplied by them, had leased the plane from Aero Ventures. After receiving the plane from Aero Ventures, Bellina flew to Westchester, New York, picked up Hochroth and Di Benedetto and the three of them, along with an unnamed co-pilot, then traveled to Fayetteville, North Carolina. In Fayetteville the three defendants removed four seats from the plane, fueled it, and Hochroth and Di Benedetto directed Bellina and his co-pilot to take off for the purpose of picking up cargo.

Both Hochroth and Di Benedetto testified affirmatively in answer to this leading question propounded by their counsel, "[w]ould you state whether you had an expectation of privacy in this plane?" They added that, "[w]e instructed [Bellina] not to let anyone onto the plane or into the plane, including gas attendants or anyone else." Di Benedetto said that this instruction was given Bellina "[b]ecause the plane was to carry property of the company, or property-cargo for the company." When interrogated as to what type of property, he testified "contraband" and then identified the type of "contraband" as "marijuana."

Apparently Hochroth and Di Benedetto remained at Fayetteville, awaiting word from Bellina. About 11:00 o'clock on the morning of December 3 Bellina telephoned Hochroth and Di Benedetto and told them where he was and the status of the plane. Hochroth and Di Benedetto proceeded in a yellow Hertz truck, with the removed seats, to Charleston, where they met Bellina. The group proceeded to the airport for the purpose of reinstalling the seats in the plane. When they reached the plane they apparently saw the seal that had been placed on the plane by the Customs Officers, realized the plane had been seized and sought to escape from the airport by crashing through the locked gate.

On this record the district court found the search of the plane invalid and suppressed the fruits of the search consisting of the marijuana seeds found in the plane.[1] It concluded that the defendants had a reasonable expectation of privacy in the plane and that the officers had violated that expectation by peering into the plane, both by climbing a ladder located several feet from the plane, and by standing on the wings of the plane. It further dismissed any "plain view" claim by the Government in support of the search because the observation of the marijuana seed on the floor of the plane was not "inadvertent." In reaching these conclusions it relied primarily on *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir. 1974), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139. We find that the district court erred in reaching such conclusions.

As we declared in the recent case of *United States v. Ramapuram*, 632 F.2d 1149, 1154 (4th Cir. 1980), and as the district court in this case recognized, the threshold question in every suppression case is "the existence of a reasonable expectation of privacy in the area searched." While it has often been stated that the Fourth Amendment "protects people—and not simply 'areas'," *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), the determination of what protection is given "[g]enerally ... requires reference to a

---

1. Although not relevant on the validity of the search since the experiment took place about ten days after the search, it is interesting that one of the searching officers took the twelve bales of marijuana discovered at the Walterboro airport and proceeded to see whether such bales could be fitted into the area of the plane vacated by the removal of the four seats between the back seats and the pilots' seats. He found that the bales fitted easily into the area, actually leaving a small walkway to the back.

'place.'" *Id.* at 361, 88 S.Ct. at 516 (J. Harlan concurring), or, as the Supreme Court phrased it in *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), the "capacity [of a defendant] to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."

▋ The burden rests on one who seeks to suppress to prove that his legitimate expectation of privacy has been violated by the challenged search. In *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980), the Supreme Court said that a defendant seeking to suppress the search of his companion's purse bore "the burden of proving not only that the search of [the] purse was illegal, but also that he had a legitimate expectation of privacy in that purse." To prove such an expectation one must exhibit by his acts and conduct an actual expectation of privacy in the *place* searched, which expectation society would consider "reasonable" or "legitimate." *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Not all places enjoy, in the eyes of society and the law, the same legitimate or reasonable expectation of privacy. One's dwelling, the physical entry into which was "the chief evil against which the wording of the Fourth Amendment [was] directed," *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), has "ordinarily [been] afforded the most stringent Fourth Amendment protection," *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); and the Supreme Court, in according that protection to the home, has consistently made a great distinction in its decisions and in the intrusions it finds to be tolerable under the Amendment between instances involving one's home or office and "those carried out elsewhere," *Payton v. New York, supra,* 445 U.S. at 586, n. 25, 100 S.Ct. at 1380, n. 25; *see also United States v. Rucinski,* 658 F.2d 741, 746 (10th Cir. 1981) (making a distinction between private houses and commercial property for Fourth Amendment purposes).

On the other hand, "an individual's expectation of privacy in his automobile is less than in other property." *United States v. Michael,* 645 F.2d 252, 257 (5th Cir., en banc 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 692, 70 L.Ed.2d 654.[2] Thus in *United States v. Chadwick,* 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977), the Court said:

"'One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . . It travels public thoroughfares where both its occupants and its contents are in plain view.'" (Quoting from *Cardwell v. Lewis,* 417 U.S. 583, 590 [94 S.Ct. 2464, 2469, 41 L.Ed.2d 325] (1974) (plurality opinion)).

And this rule of diminished expectation of privacy is particularly appropriate when the automobile is located in the street or in a public area. The importance of such circumstance was pointed out in *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 351, 97 S.Ct. 619, 628, 50 L.Ed.2d 530 (1977): "The seizures of the automobiles in this case took place on public streets, parking lots, or other open places, and did not involve any invasion of privacy." *Cady v. Dombrowski,* 413 U.S. 433, 440–42, 93 S.Ct. 2523, 2527–29, 37 L.Ed.2d 706 (1973), also made the point that "often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." It follows that, when an officer, looking into an auto-

---

2. *See also Robbins v. California,* 453 U.S. 420 at 431, 101 S.Ct. 2841 at 2848, 69 L.Ed.2d 744 (1981) (Powell, J., concurring), where Justice Powell said:

"The occupants of an automobile enjoy only a limited expectation of privacy in the interior of the automobile itself."

In *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) it was said that "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars."

mobile or plane parked on the street or in a parking lot or public airport, from a vantage point where he has a legal right to be, observes contraband in the automobile or plane, such observation does not violate the defendant's constitutional rights.

The rationale for this diminished expectation of privacy attaching to automobiles was not so much the car's mobility [3] as the considerations stated in *Cardwell v. Lewis, supra,* 417 U.S. at 590, 94 S.Ct. at 2469, quoted *supra.* Because of this diminished expectation of privacy in an automobile, the courts have not merely approved observations into the interior of cars by officers located at a point where they legally had a right to be but have gone further and tolerated intrusions involving automobiles that would have been found unconstitutional in other contexts. Thus, in *Cardwell* the Supreme Court found permissible under the Amendment the removal of paint scrapings from the exterior of a car; in *United States v. Powers,* 439 F.2d 373 (4th Cir. 1971), we allowed police officers without a warrant to open vehicle doors to determine the correct identification numbers on the side panel; and in *United States v. Michael, supra,* 645 F.2d at 257, the Court held an intrusion into a car to install a beeper to be reasonable under the Amendment.

■ And this same rule of a limited or diminished expectation of privacy that exists in connection with automobiles has been consistently held to attach to airplanes. *Patterson v. National Transp. Safety Bd.,* 638 F.2d 144, 146 (10th Cir. 1980); *United States v. Dorr,* 636 F.2d 117, 121 (5th Cir. 1981); *United States v. Gooch,* 603 F.2d 122, 123–25 (10th Cir. 1979); *United States v.*

*Groomer,* 596 F.2d 356, 357–58 (9th Cir. 1979); *United States v. Coplen,* 541 F.2d 211, 214–15 (9th Cir. 1976); *United States v. Brennan,* 538 F.2d 711, 720–21 (5th Cir. 1976); *United States v. Sigal,* 500 F.2d 1118, 1121–23 (10th Cir. 1974). In *Gooch* the Court reaffirmed its prior holding in *Sigal* that "the rule of *Chambers* [is] applicable to airplanes as well as to automobiles" even though the airplane may be less mobile than an automobile, since the expectation of privacy in an airplane is the same as in an automobile.[4]

■ But whether the property or object involved in the challenged intrusion be the home or its curtilage, with the stringent protection given it under the Constitution, on the one hand, or an automobile or plane, with its "limited" and "diminished" right of protection, on the other hand, one has no legitimate expectation of privacy in any object whether it be in the home or a car or a plane if that object is exposed to plain view. This principle was enunciated in *Katz* itself, which formulated the "expectation of privacy" rule. In that case, the Court said: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351, 88 S.Ct. at 511. A more extended definition of the plain view doctrine was later declared in *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). In that case the Supreme Court said: "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in

---

**3.** *See Cady v. Dombrowski, supra,* 413 U.S. at 441–42, 93 S.Ct. at 2528:

"Although the original justification advanced for treating automobiles differently from houses, insofar as warrantless searches of automobiles by federal officers was concerned, was the vagrant and mobile nature of the former, [citing cases] warrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent. [citing cases] The constitutional difference between searches of and sei-

zures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband."

*See also United States v. Newbourn,* 600 F.2d 452, 454 (4th Cir. 1979); *United States v. Dien,* 609 F.2d 1038, 1044 (2nd Cir. 1979).

**4.** For a fuller explanation of its reason for such conclusion *see* 603 F.2d at 124–25.

evidence." This same rule was recently re-iterated in *Payton v. New York, supra,* 445 U.S. at 587, 100 S.Ct. at 1380, where the Supreme Court declared that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable . . . ." It follows, therefore, that whenever an officer makes visual observation of contraband "from a vantage point he rightfully occupies" he has not made an illegal search within the Amendment, *United States v. Burns,* 624 F.2d 95, 100 (10th Cir. 1980), and the reason is that one who has placed an object in plain view has not "exhibited an actual (subjective) expectation of privacy" in such object. *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

Some courts have established a more exacting standard for the application of the plain view rule where the place or object in issue was in the home or within the curtilage because of the home's greater expectation of privacy.[5] Thus in *United States v. Taborda,* 635 F.2d 131, 138 (2d Cir. 1980), the court would apply the plain view rule to objects in a home if such objects are so located in the home as to be seen "by the unenhanced viewing of persons outside the home;" it would not, though, sustain the viewing as within the plain view doctrine if the observation were enhanced specifically by the use of binoculars.[6] In determining whether an observation by a police officer is from a vantage point where the officer has a right to be, the courts have in a number of cases attached importance, though not controlling importance, to "whether government agents intruded onto private property" in making their observations. *United States v. Bush,* 647 F.2d 357, 369 (3d Cir. 1981). This point was adverted to in *Cardwell,* where, in distinguishing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, the Court said:

"The present case differs from *Coolidge* both in the scope of the search and in the circumstances of the seizure. Since the *Coolidge* car was parked on the defendant's driveway, the seizure of that automobile required an entry upon private property. Here, as in *Chambers v. Maroney,* 399 U.S. 42 [90 S.Ct. 1975, 26 L.Ed.2d 419] (1970), the automobile was seized from a public place where access was not meaningfully restricted. This is, in fact, the ground upon which the *Coolidge* plurality opinion distinguished *Chambers,* 403 U.S., at 463 n. 20 [91 S.Ct. at 2036 n. 20]. See also *Cady v. Dombrowski,* 413 U.S. 433, 446–447 [93 S.Ct. 2523, 2530–2531, 37 L.Ed.2d 706] (1973)." 417 U.S. at 593, 94 S.Ct. at 2471.

The same circumstance as existed in *Coolidge* was a decisive factor in the majority opinion in *United States v. Bradshaw, supra,* 490 F.2d 1097. We declared in that case that the officer could not have made his observation "without exceeding the original purpose of his intrusion, which had justified his presence on defendant's property up to that point, and making a further intrusion into an area of protected privacy. Objects lying on the bed of the truck could not be seen except by someone who took special pains to look through the crack. The truck was parked on defendant's property very near to his residence. Under such circumstances, the defendant had a reasonable expectation that the contents of his truck would remain unknown to the general public." *Id.* at 1101. But, lest one might be led to believe that the ruling in that case was applicable to an automobile parked in what might be considered a public lot, the majority in that case directed the reader's attention, by way of contrast, to *Smith v. Slayton,* 484 F.2d 1188 (4th Cir. 1973), which involved the situation of an automobile in a parking lot and in which the observation of the officer into the interior of the automo-

---

**5.** *See United States v. Martinez-Fuerte, supra,* 428 U.S. at 561, 96 S.Ct. at 3084; *United States v. Jackson,* 588 F.2d 1046, 1053 (5th Cir. 1979).

**6.** Other courts do not, however, make this distinction with reference to enhanced or unen-

hanced viewing, as the court in *Taborda* recognized. *See* 635 F.2d at 138, n. 9. For another case expressing the same view as *Taborda, see United States v. Kim,* 415 F.Supp. 1252, 1256 (D.C.Haw.1976).

bile was found not to be invalid. *Id.* at 1101, n.2.

We are not, however, concerned here with any observation made by an officer while a trespasser on the defendant's private property, into a person's home or into a truck situated in the curtilage of that home,[7] but with observations made by an officer into the interior of a plane parked and left in a public parking lot at a public airport. In that situation it is the indisputable rule that "when a law enforcement officer makes visual observations from a vantage point he rightfully occupies," such as a public area like a public airport, there is no search and no unconstitutional intrusion. *See United States v. Burns, supra,* 624 F.2d 100. This is exactly what we held in *Smith v. Slayton, supra,* 484 F.2d at 1190, where we said:

"Here, the justification lay in the fact that the officer was in a public place, where, along with any other member of the public, he could lawfully look into Smith's car while it was parked in a public lot and see the seat cover. He did not illegally intrude on Smith's property to obtain the view of the evidence that was subsequently admitted at Smith's trial. Smith's exposure of this evidence to the plain view of the public indicates such a lack of expectation of privacy that its seizure was inoffensive."

And the rule, as applied in *Smith,* an automobile case, has been followed in the airplane cases. Thus, the rule was applied in *United States v. Groomer, supra,* 596 F.2d at 357, in validating a search of a plane located in a hangar, because, in the court's view, a hangar "was not a private place" and in *United States v. Coplen, su-*

pra, 541 F.2d 211, involving a public airport such as the Charleston airport, and in *Patterson v. National Transp. Safety Bd., supra,* 638 F.2d at 146, where the plane was at a private airport but where "[i]t would appear that the public was allowed access to the airport proper even though it was privately owned and operated." In *Coplen* the Court said:

"Our first inquiry is whether Agent Young's conduct in looking into the airplane constituted a search. The law is clear that it was not. It is well settled that visual observation by a law enforcement officer situated in a place where he has a right to be is not a search within the meaning of the fourth amendment. *See United States v. Conner,* 478 F.2d 1320, 1323 (7th Cir. 1973); *United States v. Hanahan,* 442 F.2d 649, 653 (7th Cir. 1971); *United States v. Freeman,* 426 F.2d 1351, 1353 (9th Cir. 1970); *Ponce v. Craven,* 409 F.2d 621, 625 (9th Cir. 1969). This Court, however, must also determine whether the looking into the aircraft violated appellants' reasonable expectation of privacy. If an individual knowingly exposes his conduct to public view, his reliance upon privacy is unreasonable and unjustified. . . .

. . . .

"Similarly here, we decline to conclude that the agent's conduct in looking into the airplane constituted a search within the meaning of the fourth amendment. In this case, the agent was lawfully within the area where Coplen's aircraft was parked. He proceeded to the aircraft and looked into the back window which was open to the public view. The fact that the officer was forced to use a flashlight is immaterial. Being dark outside, it was

---

7. We do not mean to suggest that all observations made on defendant's property are invalid. Each intrusion must be examined on its own peculiar facts and each must be analyzed in relation to whether the person challenging the intrusion had a legitimate expectation of privacy in the area or thing observed. The officers in *United States v. Ramapuram, supra,* 632 F.2d 1149, were on another's property but that did not invalidate the search of the automobile parked in an open field. And in *Air Pollution Variance Bd. v. Western Alfalfa,* 416 U.S. 861,

865, 94 S.Ct. 2114, 2115–16, 40 L.Ed.2d 607 (1974), the Court said: "The Court in *Hester v. United States,* 265 U.S. 57, 59 [44 S.Ct. 445, 446, 68 L.Ed. 898], speaking through Mr. Justice Holmes, refused to extend the Fourth Amendment to sights seen in 'the open fields.' " *See also, United States v. Williams,* 581 F.2d 451, 453 (5th Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), ("the distinction between open fields and curtilage is still helpful in determining the existence or not of reasonable privacy expectations.")

necessary to employ such a device. Rather, if privacy were desired here, Coplen should have closed off the window from public view. By failing to do so, thus permitting the agent by mere observation to view the marijuana debris, there was no reasonable expectation of privacy insofar as looking into windows is concerned." 541 F.2d at 214–215.

Again in *United States v. Dorr, supra*, 636 F.2d 117, a suspicious plane landed at night at a public airport, just as the plane here landed. An officer was promptly directed that night to investigate the plane. In going around the plane, he noted that the curtains were drawn back "in one of the windows allowing [the officer] a view of the interior. Shining his flashlight in the window, he saw a plastic sack with what appeared to be stems protruding from the sack." 636 F.2d at 118–119. On the basis of that observation and a subsequent consent, the plane was searched and a load of marijuana was found. The Court denied a motion to suppress, saying:

> "We find that the search of the airplane was proper under both the doctrine of plain view and Fagan's consent to search." *Id.* at 121.

Under the foregoing authorities, we perceive no unconstitutional intrusion upon the defendants' legitimate expectation of privacy by the search in this case nor are *Coolidge* and *Bradshaw*, both of which involved observations by police officers from a point on defendant's property into an area within his home or its curtilage, in point.

The district court in this case did list several reasons in support of its conclusion that the defendants had exhibited such an actual expectation of privacy in the plane involved here as to make the plain view doctrine inapplicable. The first of these was its statement that the curtains over the windows of the plane were drawn and that this represented objective evidence of an expectation of privacy in the interior of the plane. The difficulty with this suggestion of the district court, however, is that the defendants, though two of them testified, never said that they had drawn the curtains to prevent any inspection of the plane's interior or even said that they had drawn the curtains. In fact, they never mentioned the curtains in their testimony. The extent of their claim was that they had instructed the pilot to permit no one to enter physically the interior of the plane. Even more significant in this connection is the undisputed fact that not all the curtains were drawn and those that were were only partially drawn, leaving ample room to see into the interior through the windows. Thus officers Patterson and Stott, who were the only witnesses to testify about the curtains, and *whose testimony in this regard is uncontradicted*, were clear on this point. Officer Stott's testimony was that "the curtains were in some cases open, ... in some cases they were closed;" Officer Patterson's statement was that "[t]he curtains in some of the windows were partially open." Both officers were also clear that they had no difficulty in looking through the windows into the plane. Patterson stood on a wing of the plane and looked in; Stott was on a ladder several feet from the plane. A plane parked at a public airport without any coverings over all of its windows and with the curtains open on some of the windows is not an object in which it can be said a party has a legitimate expectation of privacy.

The district court suggests that in any event, Officer Patterson had not observed the interior of the plane from "a vantage point" where he had a right to be and that, therefore, his observation constituted an illegal intrusion. The basis for this claim is that Patterson stood on the wing of the plane when he made his observation. In assessing the validity of that action, though, the court must look at all the surrounding circumstances. Patterson was an experienced officer, who knew that private planes were being used frequently to smuggle marijuana into the area around Charleston and that the operators of the planes engaged in such illegal activity were accustomed to landing in the nighttime at remote airports where there were no attendants to observe their actions. The

plane in this case had arrived at the Charleston airport under suspicious circumstances. The employee at the airport immediately assumed that the pilot of the plane had attempted to land at some nearby unlighted airport. He arrived at that conclusion from the condition of the plane. It was obvious that the plane, damaged as it was, could not have traveled too far. Further, the fact that it may have attempted to land at a nearby unlighted and unattended field when it had a large, lighted, all-weather airport nearby suggested the pilot did not wish to be observed. The employee had, also, looked into the plane and ascertained that the four middle seats had been removed. The manifest purpose of this removal was the transportation of cargo. Even the employee, who was not an experienced police officer, regarded the circumstances so suspicious that he felt it proper to alert the authorities. All of these circumstances he communicated to Officers Patterson and Stott when they arrived at the airport to investigate the plane. Unquestionably the officers, armed with the information given them by the Hawthorne employee and based upon their own observation of the plane and their knowledge as officers of the practices of marijuana smugglers, all of which they were entitled to take into consideration, *United States v. Cortez*, 449 U.S. 411, 418–19, 101 S.Ct. 690, 695–96, 66 L.Ed.2d 621 (1981), would have been derelict had they not taken steps to inspect the plane. In connection with that legitimate inspection, Officer Patterson did not unconstitutionally intrude by standing on the wing in order to see into the plane to see why the seats had been removed from the plane. This was no greater intrusion than that involved in *Cardwell* or *Jackson*, supra.

■ It is, however, unnecessary to pursue the validity of Patterson's observation from the wing of the plane. Officer Stott observed the interior of the plane by ascending a stepladder which a Hawthorne employee had brought out to the plane and which he had used to look into the plane. This observation was conducted from a vantage point (*i.e.*, the stepladder) where Stott had a right to be (*i.e.*, in the open part of the public airport). It accordingly did not infringe in any way the defendants' legitimate expectation of privacy, and it validly supported the plane's search, irrespective of the validity of Patterson's observation. *United States v. Vicknair*, 610 F.2d 372, 381–82 (5th Cir. 1980).

The district court, though, appears to have assumed that, even though the ladder on which Officer Stott stood was located several feet from the plane on the public part of the airport, its use was improper and rendered Stott's observation, too, an unconstitutional invasion of the defendants' legitimate expectation of privacy. This conclusion, however, is supported neither by reason nor by authority. In *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973), revenue officers had, in order to maintain surveillance of defendant's premises, placed themselves "at the top of a 12–14 foot high embankment looking down on [the defendant's] building at a distance of 80 to 90 feet" from the building. The defendant was observed as he arrived at the building in his truck. By the use of binoculars the officers saw "boxes holding plastic containers of illicit liquor [which] were plainly visible in the truck and through the open doorway of the building." *Id.* at 38. It was not clear from the record whether the officers, as they stood on the embankment, were on the defendant's property but the court dismissed that circumstance as irrelevant since "such a location at such a distance is probably not within the curtilage." *Id.* at 38. The court held the search of the van and its seizure justified "as within the plain view doctrine."

In *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904, 48 A.L.R.3d 1172, *cert. denied*, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), the question was "whether the nocturnal observation through the windows of appellees' printshop by an FBI agent while standing on top of a ladder and using binoculars constituted an unreasonable search." 263 A.2d at 905. The Court sustained the search based on the observation made by the FBI agent from the top of the ladder.

**1346**

In *Commonwealth v. Williams,* 1979, 262 Pa.Super. 508, 396 A.2d 1286, the officers, with the aid of binoculars, had made their observation of a third-story apartment interior from a third-story apartment in a building opposite the apartment under observation. Such observation was found not to be an unconstitutional intrusion. An unenhanced observation from a ladder would be no more, actually it would not be as much, of an intrusion as would the observation at issue in *Williams.*

There is no way to distinguish Stott's action from those of the officers in *Minton* and *Hernley.* In *Hernley* the officers stood on a ladder just as Stott did here. In *Minton* the officers used a large embankment in the same manner as Stott had used the ladder to make their observations. Even more clearly than the officers in either *Hernley* or *Minton,* Stott was in a public airport at a place where he had a perfectly legal right to be. It is undisputed that at such point he could easily look into the plane's interior and that, in so doing, he saw and, as an experienced officer, identified the debris on the floor of the plane as marijuana. Such marijuana thus in "plain view" justified the search of the plane.

■ There is some intimation in the district court's opinion that the discovery of the marijuana, even though in "plain view," had not been discovered inadvertently and that inadvertent discovery is an essential element of the "plain view" doctrine. It is well established, however, that the inadvertent requirement (if it exists at all) does not attach to contraband and what was involved here was contraband, as the defendants in their testimony conceded. *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326, n. 5, 99 S.Ct. 2319, 2324, n. 5, 60 L.Ed.2d 920 ("Of course, contraband may be seized without a warrant under the 'plain view' doctrine"); *United States v. Vargas,* 621 F.2d 54, 56 (2d Cir. 1980).[8]

Finally, it should be remarked that the officers in this case acted with unusual circumspection even after they had identified the debris in the plane as marijuana and had justification to search the plane. They did not at that point search the plane but continued their investigation. They ascertained first that the owner of the plane was a doctor in New Jersey, who had placed the plane with a leasing company in that State. The leasing company had leased the plane for three days (ending on December 3) to the person who had been piloting the plane, the defendant Bellina. The officers in Philadelphia, who were pursuing the investigation with the leasing company, told the company where the plane was and its condition, including the removal of its seats. The leasing company told the officers that under their lease the defendants were prohibited from operating the plane at night and from removing or changing any of the equipment in the plane. After some discussion with its attorney who was advised that the plane apparently had been disabled while being operated at night and that some of the seats had been removed, the leasing company gave the federal officers written consent to search. It was only after they had been advised in Charleston by the federal officers in Philadelphia that they had written consent from the owner-lessor to search that any search of the plane was conducted.

■ Of course, it is traditional law that a lessor, until the termination of his lease and repossession, has no right to consent to a search. *See* 49 ALR Fed. 511, 523 (1980). But where there is no one else to be found in possession and where the lessee has admittedly misused the leased property, it is likely this traditional rule will be deemed inapplicable. *See* LaFave, *Search and Seizure,* Vol. 2, § 8.6(1), pp. 765–66. It is unnecessary, however, to resolve this issue here, since the search was plainly justified by Stott's observation conducted at a vantage point where he had a right to be.

The order of the district court suppressing the fruits of the search of the plane in

---

8. For a thoughtful discussion whether the inadvertent doctrine actually is an element in the "plain view" doctrine, *see United States v. Lib-*

*erti,* 616 F.2d 34, 38 (2nd Cir. 1980) (Newman, J., concurring).

this case is accordingly reversed, and the cause is remanded to the district court for further proceedings.

REVERSED AND REMANDED.