UNITED STATES of America, Plaintiff,

v.

Kelly D. POWELL, Defendant.

No. 2:96–00039.

United States District Court,
S.D. West Virginia,
Charleston Division.

June 7, 1996.

---

Miller A. Bushong III, Assistant U.S. Attorney, Charleston, WV, for plaintiff.

Edward H. Weis, Ass't. Fed. Public Defender, Charleston, WV, Brian Glasser, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, for defendant.

### *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

The Court heard evidence on Defendant's motion to suppress May 30, 1996. After careful consideration of the evidence, the record, argument of counsel and the memoranda submitted on the legal issues, the Court **GRANTS** the motion.

### I. FINDINGS OF FACT

On March 1, 1996 the Metropolitan Drug Enforcement Network Team (MDENT) received an anonymous telephone call from a female informing there was cocaine to be found on a table at 5620 Staunton Avenue, a residence in Kanawha City, West Virginia (the "house").[1] Hearing trans. at 3. Detective Brian Jones, then an MDENT member, was familiar with the house. *Id.* Several months earlier, in November, 1995, Patrolman Valerie Stragie sent a "CPD 102" to MDENT reporting a neighbor's complaints about drug activity allegedly occurring at the house.[2] *Id.* Jones further testified that af-

---

1. The remaining citations to the suppression hearing transcript will be denoted "T. __."

2. The CPD 102 was not offered as an exhibit at the hearing, but the Court, nevertheless, attaches it to this opinion. The report's contents are not

ter the initial complaint in November and during the interim to March 1, 1996, MDENT was contacted frequently by officers assigned to the Kanawha City area concerning possible drug activity in the house. Transcript of prelim. hearing at 14–15.

Jones admitted the CPD 102 identified the owner of the house as Ms. Gray–Price and that he was aware of this fact in November, 1995. T. 12. Jones offered no basis upon which one could conclude ownership of the house may have changed in the ensuing four months. *Id.* Jones acknowledged he had not reread the CPD 102 prior to visiting the house on March 1. *Id.* In fact, Jones concedes his team took no action on March 1 to establish who owned or resided at the house before seeking consent to enter without a warrant. T. 14.

Officer Jones did do the following. He notified his MDENT supervisor, Steve Utt, of the anonymous call. Lieutenant Utt told Jones to do a "knock and talk."[3] *Id.* With-

out a search warrant (T. 10), Jones went to the house at approximately 6:00 p.m., accompanied by four or five officers including one in uniform. T. 4. When Jones rang the doorbell, Walter Myers answered the door. T. 5. Jones testified he was acquainted with Myers because he (Jones) was in the same high school class as Myers' sister and Myers himself was two years behind them in school. T. 10–11. Jones also said he "had no idea" at the time whether Myers lived or even stayed at the house. T. 10. Nor did Jones ask Myers why he was in the house or whether he owned or lived in it. T. 14.

Jones advised Myers of the complaint regarding drug activity and asked Myers if the officers could enter the house. T. 5. Myers acceded to the request. *Id.* By this act alone, Jones claims he believed at that moment Myers *owned* the house.[4] T. 10. Immediately after, as the officers and Myers were proceeding toward or into the living room area, Jones asked Myers if he owned the residence.[5] Myers responded "no." T.

---

being considered for truth, but for the sole purpose of ascribing to MDENT's Officer Jones notice or knowledge of the report's contents.

The CPD 102 identifies the owner of 5620 Staunton Avenue as Bambi Gray–Price. The informant for the CPD 102 stated Ms. Gray–Price lived alone. The informant also gave the patrolman the license number from a vehicle which had visited the house previously. As conceded by Jones, the license number belongs to Walter Myers and Myers' address was listed in Department of Motor Vehicles records in November, 1994, as 5601 Staunton Avenue. T. 13. The report suggests Mr. Myers moved from 5601 Staunton Avenue in 1994, but this is the address Mr. Myers gave the officers when he was questioned on March 1. *Id.*

3. This is the first case in which the Court has encountered what has been characterized as a "knock and talk" procedure. A "knock and talk" occurs where the officer (1) visits the residence, (2) identifies himself, (3) asks to be admitted to the house, and (4) then seeks consent to search. T. 3–4. The utility of this procedure to law enforcement is obvious: It avoids the necessity of securing a search warrant from a judicial officer. While the potential for abuse is apparent, courts and commentators appear to concur the practice can be lawful. *See, e.g., United States v. Cruz,* 838 F.Supp. 535, 543 (D.Utah 1993) (collecting cases); *see* 1 Wayne R. LaFave, *Search and Seizure—A Treatise on the Fourth Amendment,* § 2.3(b) (3rd ed. 1996).

4. This same act by Myers led Detective Timothy Johnson to testify the officers merely concluded

Myers "*may* have been *possibly* the owner of the" house. T. 26. (emphasis added). *See also* T. 31 (Johnson stating "I didn't really know who the owner was. We thought he may have been the owner.")

5. There is some conflict on this point. At one point during his testimony, Jones testified "We all came in and went toward the living room area of the residence and I asked Meyers [sic] was he the owner of the residence and he stated, no." T. 5. This indicates Jones asked the question while the officers were proceeding toward the living room area which contained the dining room. T. 6.; *see also* trans. of prelim. hearing at 7–9. Jones' later testimony, however, suggests the ownership question was raised while the officers were in the living room. *See, e.g.,* T. 6, 17. Detective Johnson's testimony suggests the officers ascertained Myers did not own the residence while they were in the living room area. T. 23, 26.

The government also appears to argue that, prior to learning Myers could not give valid consent to the search, a Detective Armstrong saw a bag of marijuana in plain view on the dining room table. The Court rejects that as speculative, however, because there is no chronological evidence to support the position. In fact, while Jones testified he saw nothing of note upon entering the living room, he later informed the United States during argument that he, too, saw the marijuana in plain view on the table prior to learning of Myers' inability to consent. *Compare* T. 21 *with* T. 48. The Court sustained the Defen-

5. Myers stated he lived up the street and that the owner of the house had just left. T. 6. Myers then gave the officers consent to search the residence. *Id.* Significantly, Jones refused the offer and opined that since Myers was not the owner of the house he could not give valid consent to a search. *Id.* In Detective Johnson's words, the consent was not valid because Myers "wasn't the rightful owner of the residence and didn't have control and custody of the house." T. 23. Indeed, the record reflects Myers was no more than a casual visitor and that the officers entering the house were put on immediate notice of that fact.

At this point, Kelly Powell, the Defendant and movant, became involved in the scenario. When the officers accomplished entry into the house, Powell was using the telephone in the living room. He was visible to the officers. At an indeterminate time, Detective Johnson asked the Defendant to hang up the phone he was using. T. 7. Powell complied and arose from the couch. Johnson asked him for identification. *Id.* While Defendant was removing his wallet, and after Jones was aware Myers could not give valid consent to a search, Johnson noticed a plastic bag with "green vegetation" sticking out of Defendant's shirt pocket. *Id.;* T. 24, 46. When Johnson reached for the bag, Defendant resisted by "stiff arm[ing]" the officer.[6] T. 7. When Defendant ignored warnings to cease resisting, the officers put him "on the ground," handcuffed him and searched his person. T. 7–8. In addition to the marijuana found protruding from Defendant's shirt pocket, the officers discovered a quantity of cocaine and cash on Powell's person. *Id.*

Christopher Craig, the son of Defendant's girlfriend, testified without contradiction that Defendant was, at the very least, an over-night guest at the house. T. 33. According to Craig, Defendant and Craig's mother first traveled to West Virginia in January 1996 and both stayed at the house. *Id.* Craig phoned the house every other day and spoke with the two or left a message. T. 34. When Craig moved to West Virginia in mid-February, he continued calling Defendant at the house every other day. *Id.* This pattern continued until Defendant's arrest. T. 35. Craig further testified that Defendant (1) kept clothes at the house; (2) parked Craig's mother's car there; (3) paid rent and bills at the house; and (4) had all around basic use of the house[.]" T. 35, 37–38. Defendant testified (1) he had a key to the house; and (2) he resided at the house for at least two weeks prior to his arrest. T. 39–40.

## II. CONCLUSIONS OF LAW

### A. *Standing:*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures ... shall not be violated...." U.S. Const. Amend. IV. A defendant's standing[7] to object to an illegal search is a necessary prerequisite, however, to asserting a Fourth Amendment violation.

■ The standing inquiry is a pragmatic determination of whether the movant is the proper party to (1) assert the illegality of the search; and (2) seek the exclusionary rule's protection. *See* 5 *LaFave, supra* § 11.3. This is consistent with the notion that "rights assured by the Fourth Amendment are personal rights [which] ... may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by

---

dant's objection to reopening the case to allow additional testimony. Based on the evidence adduced before the parties rested, the Court finds there was no contraband discovered in plain view prior to Jones learning of Myers' inability to consent to the search.

6. Johnson testified the Defendant shoved him backwards "almost over the living room table." T. 24. Jones' testimony is different, stating Defendant simply "put his hands" on Johnson and was "stiff-armed." T. 7.

7. The use of the term "standing" is somewhat inartful. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 138–39, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1978) (questioning "whether it serves any useful analytical purpose to consider [the principle that Fourth Amendment rights are personal rights as] a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.") *But see* 5 LaFave, *supra,* § 11.3 (noting the term's usefulness). Nevertheless, the parties employ the term and the Court will likewise.

the search and seizure[.]" *Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968).

It is well settled that standing " 'depends ... upon whether the person who claims the protection of the [Fourth] Amendment has a legitimate expectation of privacy in the invaded place.' " *See, e.g., Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)); *United States v. Al-Talib,* 55 F.3d 923, 930–31 (4th Cir.1995). The Supreme Court has held that an individual's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson,* 495 U.S. at 96–97, 110 S.Ct. at 1688; *Bonner v. Anderson,* 81 F.3d 472, 475 (4th Cir.1996); 5 LaFave, *supra* § 11.3(b) (opining "it is quite clear *Olson* amounts to a per se rule that" an overnight guest has a legitimate and reasonable expectation of privacy in the home).

■ Based on undisputed evidence, Defendant was more than an overnight guest in the house. Accordingly, the Court concludes Defendant has standing to assert a Fourth Amendment violation.

### B. The Reasonableness of the Search and Seizure:

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *United States v. Campbell,* 945 F.2d 713, 715 (4th Cir.1991) (stating "Warrantless entries into a residence are presumptively unreasonable."); *see* 1 La-Fave, *supra* § 2.3(b) (stating "It is beyond question, therefore, that an unconsented police entry into a residential unit, be it a house or an apartment or a hotel or motel room, constitutes a search within the meaning of"

Supreme Court precedent) (footnotes omitted).[8]

A well recognized exception to the warrant requirement occurs when an officer first secures the voluntary consent to enter "from the individual whose property is searched ... or from a third party who possesses common authority over the premises[.]" *Rodriguez,* 497 U.S. at 181, 110 S.Ct. at 2797. *Rodriguez* took this analysis one step further: even if the consenting third party does not possess actual common authority over the premises, no Fourth Amendment violation will be found it the police reasonably believed at the time of their entry that the third party possessed such authority. *Id.* at 189, 110 S.Ct. at 2801–02; see *United States v. Kinney,* 953 F.2d 863, 866 (4th Cir.), *cert. denied,* 504 U.S. 989, 112 S.Ct. 2976, 119 L.Ed.2d 595 (1992). *Rodriguez,* however, further notes and qualifies as follows:

> As *Stoner* [*v. State of Cal.,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) ] demonstrates, what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accomplished by an explicit assertion that the person lives there, *the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.* As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: *would the facts available to the officer at the moment ... "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful* unless authority actually exists. But if so, the search is valid.

*Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. at 2801 (emphasis added) (citations omitted).

8. This, of course, contradicts Jones' bald conclusion the officers did not "search" the house. T. 11. In any event, the Government appears to concede that a warrantless entry into a home, absent some recognized exception to the warrant requirement, would amount to a Fourth Amendment violation. *See* T. 45. (Stating, "The position of the United States is the prohibition against a warrantless entry into a house does not apply when voluntary consent has been obtained.")

Based upon the above findings the Court concludes the officers' warrantless entry of March 1 was unlawful for at least two reasons. First, the officers could not reasonably believe Myers owned or possessed common authority over the house at the time of the entry. As the Government concedes in its response brief, "MDENT officers had documented information about suspected drug activity occurring at 5620 Staunton Avenue prior to March 1, 1996." Resp. br. at 1. This documentation, which was *available* to the officers and which had been previously reviewed by Jones, contained information (1) the owner of the house was a female; (2) the female lived alone; (3) a number of visitors, perhaps like Myers, came to the house for short periods of time; (4) an automobile owned by Myers, an individual Jones knew from high school, had previously been seen at the house; and (5) Myers appeared to live elsewhere.

These facts, considered with Myers' mere willingness to let the five officers pass the threshold, would not warrant a reasonably cautious officer to the belief, without further inquiry, that Myers had authority over the premises.[9] Further, Jones' putative firm belief Myers was the owner or had common authority over the house simply because he let the officers into the house is belied by Johnson's uncertainty of control or ownership. See T. 26. (Johnson stating "We thought he *may* have been *possibly* the owner of the residence.") (emphasis added). Accordingly, the entry at the doorstep was impermissible. A casual review of the CPD 102, which was indexed by its address, or even one brief question posed to Myers at the doorstep concerning his authority to consent, could have resolved the issue. When balanced against the warrantless intrusion into the sanctity of a dwelling place, the burden placed on investigating officers was minimal.[10] *See United States v. Bellina*, 665 F.2d 1335, 1340 (4th Cir.1981) (stating "the physical entry into [one's dwelling] ... was 'the chief evil against which the wording of the Fourth Amendment was directed.'") (quoted authority omitted).

Second, the Court finds and concludes on the totality of the circumstances and credible evidence, no contraband was discovered in plain view by any officer prior to Jones learning of Myers' incapacity to consent. Once the officers learned of Myers' incapacity, they were required to leave immediately. Their failure to do so and subsequent examination of the Defendant and the room was unlawful and impermissible under the Fourth Amendment.[11]

## III. CONCLUSION

Based on the foregoing, Defendant's motion to suppress is **GRANTED**. The Gov-

---

9. The facts in *Rodriguez* and *Kinney* clearly justified a reasonable belief of common authority and are worth comparing to the instant case. In *Rodriguez*, the third party (1) showed signs of a severe beating; (2) told the police the defendant had beaten her in what she referred to several times as "'our' apartment"; (3) said she had clothes and furniture at the apartment; (4) knew the defendant was asleep in the apartment at the time; and (5) accompanied the officers to the apartment, where she admitted them with her key. Even faced with these clear indications that the police reasonably could have believed the third party had authority to consent as a matter of law, the Supreme Court nevertheless left that determination to the state court on remand.

In *Kinney* the third party (1) called 911 to report she had found guns in a closet in an apartment shared by her and the defendant; (2) stated she was the defendant's girlfriend; (3) knew the defendant was asleep at the time; (4) admitted the officers to the apartment; and (5) told the officers she had lived at the apartment for four months. The Court easily concluded the third party "was obviously an inhabitant of the apartment." *Kinney*, 953 F.2d at 867.

10. The Court is well aware that under many circumstances "police are entitled to assume without specific inquiry as to that person's status, that one who answers their knock on the door has the authority to let them enter." 3 LaFave, *supra*, § 8.5(e). Application of that rule to the facts of the instant case, however, would be inappropriate given the information available to Jones at the time. As noted elsewhere by the same commentator, "sometimes the facts known by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss.'" *Id.* § 8.3(g) (stating also "under a sound application of the apparent authority rule the police must be required to make reasonable inquiries when they find themselves in ambiguous circumstances.")

11. The Court makes its determinations with an awareness of *Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

ernment does not argue there is an attenuated connection between the illegal search and the evidence seized from and the statements made by Defendant. Neither does the Government appear to assert the independent source, inevitable discovery or other recognized exception to the exclusionary rule. Accordingly, the Court **SUPPRESSES** (1) the contraband and money obtained from the search of Defendant's person; and (2) any and all statements Defendant made to law enforcement officials before, during and after his arrest.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel, the Marshal for the District and the Probation Office of this Court.